JOHN BURKE, APPELLANT AND CROSS-APPELLEE, V.
KENNETH HARMAN, APPELLEE AND CROSS-APPELLANT.
574 N.W. 2d 156

Filed January 6, 1998.   No. A-96-846.

Charles H. Wagner and Maureen Freeman-Caddy, of Edstrom, Bromm, Lindahl, Wagner & Miller, for appellant.

Terry R. Wittler, of Cline, Williams, Wright, Johnson & Oldfather, for appellee.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

SIEVERS, Judge.

A Navajo chief's blanket, first phase, Ute style, is a rare and beautiful object because of its historical and ethnographic significance, as well as its art; all of which add to the blanket's great value. Such blankets were handwoven by Navajo women before 1850. The plaintiff, John Burke, acquired such a blanket by purchase for $115 from an antique mall in Lincoln. He sold the blanket to the defendant, Kenneth Harman, for $1,000. Harman sold the blanket to an individual in New York for

$290,000. Burke has sued Harman for $289,000, claiming that Harman falsely or negligently misrepresented the blanket as a substantially less valuable Mexican weaving.

## FACTUAL BACKGROUND

John Burke resides in Ithaca, Nebraska, and his work is primarily wood carvings of Native Americans, mountainmen, early American historical figures, Civil War figures, and the like. In order to lend authenticity to his work, Burke engages in some collecting of historical artifacts involving his subject matter, which he studies and then typically sells or trades when he is finished with them. Burke teaches his wood-carving art throughout the United States and has published several how-to books on the subject.

Kenneth Harman holds a bachelor of arts degree in education and has taught first grade at Arnold Elementary School in Lincoln for over 23 years. Harman says that he has been a collector since he was 10 years old. Initially, he collected toys, and he eventually completed a collection of high quality Lehmann toys made in Germany, which is now on display in Nuremberg, Germany. In the late 1980's, Harman began collecting Indian baskets. He has also collected advertising signs and comic strip toys. Prior to the transaction at issue here, Harman had owned a total of 12 weavings, which he believed to be Native American. All of those weavings were rugs rather than blankets, and the most expensive was purchased from Daphne Deeds for $4,250. Harman tried to sell that rug in New Mexico without success and ultimately traded it for an Indian basket from the Morning Star Gallery. Three of the other weavings which he acquired turned out to be Mexican rather than Indian, which he returned to the sellers. Mexican weavers have done, and continue to do, imitations of the Navajo weavings, and these imitations are much less valuable than the Navajo weavings. One of the first guideposts in determining the value of a Southwestern weaving is to determine whether the weaving is Indian or a Mexican "knock-off." Harman estimated that of the eight weavings he owned at the time of the transaction in question with Burke, he had paid $1,200 to $1,400 for all of them.

Harman has a reference library of some consequence in his home dealing with collecting and collectibles. His library

included at least two reference books which displayed pictures of Navajo chief's blankets, first phase, Ute style. The books are entitled "Weaving of the Southwest," by Marian Rodee, and "The Navajo Weaving Tradition 1650 to the Present," by Alice Kaufman and Christopher Selser. He also had copies of American Indian Art magazine, which reported on the sale of several chief's blankets. Prior to the transaction at issue, Harman had sent one of the other weavings he had acquired to Sara Alexanian of Albuquerque, New Mexico, who works with her husband in the cleaning, buying, and selling of rugs and blankets, including Navajo textiles, but she returned the weaving to Harman because it was Mexican and therefore not worth her time or his money. Alexanian explained that the Navajo blankets were much more finely woven than rugs and were used as trade items with other tribes and as wearing apparel.

The story of the particular Navajo chief's blanket involved in this case began before 1850, when it was handwoven in the Ute style by a Navajo woman. The Ute Indians, with whom the Navajos traded, preferred the ivory, chocolate brown (natural colors from the wool), and indigo (naturally dyed) stripe pattern seen on this blanket—hence the name "Ute style." The name indicates a particular and recognizable style of chief's blanket. According to Alexanian, the term "first phase" means that it was woven before there were white settlers in the Southwest.

The history of the blanket involved in this case, at least for us, begins on July 1, 1993, when Burke attended the opening of St. George's Antique Mall in Lincoln. Burke was the second customer in line to enter the business. There, he purchased the blanket for $115. It had a price tag of $115 on it from its owner, Tedd Whipple of Grand Island, who had placed it at the mall for sale. On the tag, Whipple described it as a "1930's Southwest wool handwoven throw." Burke testified that the blanket was placed on the floor in front of the fireplace at his home. On August 1, a houseguest, William Hackett, inquired about the rug. Burke indicated that he did not know anything of its background or origin. Burke and Hackett discussed the matter and concluded that some effort should be made to determine its age and origin, and in that regard, Harman's name occurred to Burke. Burke and Harman had known each other since early

1993, when Harman had called Burke about some items Burke had displayed for sale at the Antique Market in Lincoln. As a result, the two men met, and Harman purchased items from Burke.

Burke, Hackett, and the blanket proceeded to Harman's residence on August 1, 1993, after Burke had called Harman about looking at the blanket. There is a sharp conflict about the time of day on August 1 when the meeting took place. Burke recounts that it was at 8 o'clock in the evening and that he left about 8:30. Burke supports his timeframe with his phone records, which show a call to Harman at 7:30 p.m. for 4 minutes at a cost of 24 cents. Under Burke's testimony, this is the pre-meeting phone call to Harman approximately 30 minutes before arrival at Harman's house. Harman concedes that Burke called before bringing the blanket to his house but asserts that Burke arrived around 1 p.m.

The meeting time is important because of other inferences which might flow therefrom. For example, the record establishes a long distance phone call from Harman's residence to Whipple on the night of August 1 at 8:28 p.m., which, according to Burke and Hackett, would have been within minutes of their departure. Whipple testified that in this conversation with Harman there was no suggestion that the weaving was of Mexican origin or that Harman did not know what kind of weaving it was. According to Whipple, he remembered Harman using the words "'early Navajo rug'" in that conversation. Harman's timeframe is important to his defense, because he relates that after buying the weaving he attempted to identify the weaving, which included calling St. George's that day to find out who had placed it there, waiting for a return call with that information, looking at his reference books, and only calling Whipple after getting his name from St. George's. But Harman's evidence is that St. George's closes at 8 p.m. and that he could not have gotten that information if the meeting occurred when Burke said it did. In short, Burke says his timeframe shows that Harman did not have to research anything about the weaving, because Harman knew from the outset that the weaving was an extremely valuable Native American blanket. On the other hand, Harman says his timeframe and what he

did shows that he did not know what the weaving was and that he undertook a number of steps to find out.

After 1,100 pages of testimony, several videotaped depositions, and three boxes of exhibits, the essence of the case still comes down to the conflicting versions of the conversation at Harman's home on August 1, 1993, regardless of the time of day that it occurred. When the meeting took place, what Harman did or did not do thereafter, and the inferences to be drawn therefrom arguably support each party's version of the conversation, depending upon what is concluded about the underlying facts. At the simplest level, Burke's lawsuit asks the questions: "What did Harman know, and when did he know it?"

Burke's version of the meeting is that after Harman rolled out the blanket for examination, Harman told Burke that it was Mexican and that in Sante Fe it was worth $1,500 to $2,000. Harman offered Burke $500 plus two Indian Skookum dolls for the weaving. When Burke refused that offer, Harman offered $1,000 cash, which Burke accepted. Burke had also brought an Indian basket along, which Burke sold to Harman for $250. Harman admits in his testimony that he was asked by Burke, "What do you think it is?" But he relates that he told Burke that it could be Mexican or Indian and that he gave no opinion as to its value except in reference to its condition in relation to the rug he had acquired from Deeds, Harman saying that Burke's weaving was in poorer condition. Harman testified that he liked the weaving and that he asked what Burke wanted for it, to which Burke responded with, " 'What will you give me?' " Harman responded by offering Burke $500 in cash plus the two Indian Skookum dolls which he had lying on the table, preparing to pack them to take to Santa Fe. Harman related that Burke did not think the dolls were worth the $500 asserted by Harman. Harman testified that he then said, " 'I'll give you a thousand dollars for your blanket.' " According to Harman, Burke's response was, " 'Hell, yes. I'll sell it for $1,000.' " Harman paid Burke $1,250 in cash for the blanket and the basket, and Burke and Hackett left.

The blanket was identified as a Navajo chief's blanket, first phase, Ute style. Howard Grimmer, the former owner of Morning Star Gallery in Santa Fe, which handles valuable

Indian artifacts, put the matter in perspective when he testified that even if a person had $500,000 in a checking account and wanted to buy a first phase blanket on a particular day, he did not think that anyone could do it, because the blankets are very rare, and there are only a "handful of them in public hands and those only move occasionally." Harman sold the blanket a year after he got it from Burke to an individual in New York for $290,000. The parties have stipulated that on August 1, 1993, the blanket Burke sold to Harman had a "fair market value of $290,000." Additional facts from the record will be provided as necessary in our discussion of the issues raised by the appeal.

## PROCEDURAL BACKGROUND

The case was apparently tried on the fourth amended petition (petition), as that is the only petition in our transcript. That petition alleges that Harman represented to Burke that he had knowledge and expertise in reference to Native American artifacts, including weavings, and that Harman represented to Burke after examination of the weaving that it was not of Native American origin but was a Mexican blanket with a value in the area of $1,500 to $2,000. The petition alleges that those representations were false, as the blanket was of Native American origin with a value in excess of $250,000, which facts "were suppressed or concealed by [Harman] with the intention that [Burke] be [misled] as to the true condition of the property; that [Burke] was reasonably so [misled] and suffered damages as a result . . . ."

The petition further alleges that when Harman made the affirmative representations to Burke, Harman "either knew the statements and representations were false, or said statements were made recklessly by [Harman] without knowledge of their truth, but represented to [Burke] as positive assertions." Alternatively, Burke pleads that the proposed transaction was one where Harman had a pecuniary interest and supplied false information to Burke which Burke justifiably relied upon and that Harman "failed to exercise reasonable care or competence in obtaining or communicating the information" about the origin of the blanket and its value. Burke further alleges that the representations

of Harman were made with the intent that Burke rely upon them and as an inducement for Burke to sell the blanket to Harman and that, as a result, Burke has been damaged in the sum of $289,000.

Harman's answer to the petition preserved his demurrer that a cause of action based upon neither fraudulent misrepresentation nor negligent misrepresentation was stated and, additionally, that Burke had not "pled the proper measure of damages." As affirmative defenses, Harman alleged that Burke was contributorily negligent in failing to use ordinary care to independently research the origin and value of the blanket and that such contributory negligence was the cause of any damage. As a second affirmative defense, Harman alleges that it is the trade and custom of buyers and sellers of antiques to make their own independent determinations of value and not to rely upon the valuation of a buyer. The third affirmative defense alleges that prior to August 1, 1993, Burke had contacted Harman approximately a dozen times about buying or trading for antique items owned by Burke and that a course of dealing had been established where each person independently arrived at prices and values for the goods they were buying, selling, or trading.

Trial before a jury in the district court for Lancaster County began on May 13, 1996, and the jury returned its verdict in favor of Harman on May 21. The trial court submitted the case to the jury only on the claim of fraudulent misrepresentation, outlining that the plaintiff must prove by a greater weight of the evidence that (1) Harman made the claimed representation; (2) the representation was false; (3) the representation was made fraudulently; (4) when the representation was made, the intent was that Burke would rely upon it; (5) Burke did rely upon the representation; (6) Burke's reliance was reasonable; and (7) the representation was the proximate cause of some damage to Burke and the nature and extent of the damage.

In the instructions on effect of findings, the court instructed the jury that if Burke had met his burden of proof, the verdict must be for him in the amount of $289,000. No affirmative defenses were submitted to the jury. After Burke's motion for new trial was denied, a timely appeal was filed to this court.

## ASSIGNMENTS OF ERROR

Burke assigns that the trial court erred (1) in granting Harman's motion for a partial directed verdict as to Burke's claim based on negligent misrepresentation; (2) in refusing to allow the use of the deposition of Ralph Soloman Silverheels; and (3) in denying Burke's proposed jury instructions (a) on presentation of videotape testimony, (b) that contributory negligence is not a defense to fraudulent misrepresentation, (c) on negligent misrepresentation, and (d) on reliance. As his fourth assignment of error, Burke claims that the lower court erred in instructing the jury by giving inconsistent instructions and failed to properly instruct on the issues of justifiable reliance and whether contributory negligence is a defense to fraudulent misrepresentation.

## STANDARD OF REVIEW

To establish reversible error from a court's failure to give a requested instruction, an appellant has the burden of showing that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the tendered instruction. *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997); *Kent v. Crocker*, 252 Neb. 462, 562 N.W.2d 833 (1997).

On questions of law, an appellate court has an obligation to reach independent conclusions irrespective of the decision made by the court below. *State v. McBride*, 252 Neb. 866, 567 N.W.2d 136 (1997).

A party against whom a motion for directed verdict or a motion to dismiss is directed is entitled to have all relevant evidence accepted or treated as true, every controverted fact as favorably resolved, and every beneficial inference reasonably deducible from the evidence. *Burns v. Veterans of Foreign Wars*, 231 Neb. 844, 438 N.W.2d 485 (1989).

## ANALYSIS

*Silverheels' Deposition.*

On February 20, 1996, the deposition of Ralph Soloman Silverheels was taken in Albany, Oregon, at the instance of

Burke. Burke's counsel and a court reporter were present in Albany with Silverheels, and Harman's counsel participated by telephone from Lincoln. Silverheels described himself as a "[N]ative American fine art dealer" and said that he had an antique store in Omaha at the time the transaction concerning the weaving took place. The general substance of Silverheels' testimony was that he had become acquainted with both Burke and Harman through antique trading. In the past, before the transaction which is the subject of this litigation took place, Harman had contacted Silverheels to inquire whether he had good weavings and baskets, in particular whether he had any first phase, second phase, or third phase weavings, or any older Hopi weavings.

Silverheels also testified that Harman had been in his store looking at weavings and, in particular, had examined a third phase weaving in the summer of 1993. Silverheels testified that he first heard about Harman's acquisition of the first phase weaving when an acquaintance told him that Harman had obtained a "very, very nice Navajo weaving" and was looking to sell it for $350,000 to $450,000. Silverheels and Harman talked by phone, and they discussed how Harman had obtained this weaving, as well as a price for the weaving. In particular, Silverheels testified:

> He [Harman] had told me that he had bought a first phase chief's blanket and that he had come onto it with great luck, that — excuse my language, a dumb fat fucker that had bought it at an antique — like a fle[a] market or an antique store, that he told him it was Mexican, and that he gave him a thousand bucks for it, told him it was worth two thousand.

Silverheels indicated to Harman that he would like to see it. According to Silverheels, Harman left a photograph of the weaving in Silverheels' store when Silverheels was absent from the store. Silverheels testified that his nephew received the photo and wrote " 'Photograph of first phase Ute Navajo blanket' " with Harman's phone number on the back of the photograph. By the time Silverheels contacted Harman about the weaving after seeing the photograph, Harman had already sold it.

Under cross-examination at his deposition, Silverheels refused to answer approximately 20 questions posed by Harman's counsel. Summarized and reorganized, the specific questions he refused to answer were: (1) his father's last name, (2) his mother's last name, (3) the name on his birth certificate, (4) the city in California where he went to high school, (5) the year he graduated from college, (6) the college he graduated from, (7) specifics of his military career, (8) whether he still owned his former house in Omaha, (9) whether he was wounded in the line of duty as a police officer, (10) his current residential address, (11) the address of his nephew who worked in his Omaha store, (12) whether he told anyone in Omaha he was the grandson of Tonto from "The Lone Ranger," (13) whether he told people in Omaha that he was a lawyer in California, (14) whether he had represented himself as the chief of an Indian tribe, (15) specifics about Putgrand Auction and Silverheels' lawsuit against Heartland Estates and Bill Kauffman, (16) when his name legally became Ralph Soloman Silverheels, (17) whether he has been known by any name other than Silverheels, (18) the significance of June 6, 1980, (19) the name of his shop in Arizona, and (20) the tribe of which he is a member.

Several times after refusing to answer a specific question, Silverheels offered to explain to a judge why he would not answer, adamantly insisting that the judge would rule in his favor, and asserted, "The United States government . . . allow[ed] [him] the privilege [not to answer] by [C]ongress." He also stated that he would be more than willing to come to Lincoln to testify. At the close of the deposition, Harman's counsel stated that he was planning to make either a motion to compel Silverheels to answer the questions he refused to answer or a motion to strike his entire deposition testimony. The record before us reveals that Harman's counsel opted for the latter option, because in a motion in limine filed before trial, Harman asked the court to exclude

all testimony of Ralph Soloman Silverheels contained in his deposition of February 20, 1996 for the reason that:

a. The witness indicated in his deposition that he is willing to appear and he is therefore not "unavailable" under Neb. Rev. Stat. § 27-804(2)(a);

b. The defendant was deprived of his right to effectively cross-examine the witness at his deposition by the witness's refusal to answer appropriate questions; and

c. The probative value of the testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury in violation of Neb. Rev. Stat. § 27-403.

In a journal entry, the trial judge ruled that Silverheels' deposition would be excluded at trial because the questions he refused to answer did not "relate to mere collateral or cumulative matters," but, instead, were "highly relevant" credibility issues and that Silverheels' refusal to answer unfairly deprived Harman of his right to cross-examination. Because the motion in limine concerning Silverheels' testimony was sustained, there was no mention of Silverheels in the trial record other than when Burke unsuccessfully offered the deposition at trial. During cross-examination of Harman, the following exchange took place between Burke's counsel and Harman:

Q. Okay. Mr. Harman, did you ever tell an antique dealer in Omaha that you purchased a chiefs blanket from a big dumb fat so and so?

A. No, I certainly did not.

. . . .

Q. Are you aware of anyone, other than . . . Burke, who contends that you made such a statement to a dealer in Omaha?

A. No.

Harman also testified on both direct and cross-examination regarding the people he contacted after he obtained the blanket from Burke, and Silverheels was not one of the people Harman admitted contacting.

Burke argues that the trial judge erred in refusing to admit any of the deposition of Silverheels merely because the witness failed to answer collateral background questions.

Neb. Rev. Stat. § 27-804 (Reissue 1995) states in relevant part:

(2) Subject to the provisions of section 27-403, the following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(a) Testimony given as a witness . . . in a deposition taken in compliance with law in the course of the same or a different proceeding, at the instance of or against a party with an opportunity to develop the testimony by direct, cross, or redirect examination, with motive and interest similar to those of the party against whom now offered.

Unavailability is defined in part by § 27-804(1)(e) as including situations when the declarant "[i]s absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means." Additionally, Neb. Ct. R. of Discovery 32(a)(3)(B) (rev. 1996) contains a more precise definition of unavailability: "[T]he witness is at a greater distance than one hundred miles from the place of trial or hearing, or out of the state, or beyond the subpoena power of the court, unless it appears that the absence of the witness was procured by the party offering the deposition." Neb. Rev. Stat. § 25-1227 (Reissue 1995) provides that a witness in a civil trial cannot be compelled to attend a trial outside of the state where he or she is served with a subpoena or at a location more than 100 miles from his or her residence.

Silverheels lived in Oregon, well outside of the reach of a subpoena from the Nebraska trial court. Although Harman's motion asserted Silverheels was "available" as a ground for excluding this deposition, the trial court did not rely on that ground in excluding the deposition. Harman's brief in this court does not assert that Silverheels was "available." Harman did assert at oral argument that Silverheels was "available," because Silverheels said he would return to Lincoln to testify. But we are cited to no authority that such a statement at deposition makes the witness "available," nor have we found any authority on our own for this proposition. Rather, § 25-1227 and rule 32(a)(3)(B) make distance and whether the witness can be reached by the court's subpoena power the conclusive test of "availability," unless the proponent of the testimony "arranges" the witness' unavailability—and there is no claim or evidence of such here.

It has been held that rule 32, in most cases, will not create different conditions for admissibility than does § 27-804. *Maresh v. State*, 241 Neb 496, 489 N.W.2d 298 (1992).

Moreover, an occurrence witness, as Silverheels would be, is not required to travel more than 100 miles to attend trial pursuant to subpoena. See *id.* Thus, we are satisfied that Silverheels, who lived in Oregon, was unavailable to testify as contemplated by § 27-804(2)(a) and rule 32(a)(3)(B).

The deposition was taken via stipulation, and no claim is raised under § 27-804 that it was not in accordance with Nebraska law, or Oregon law for that matter. That the parties and their motives were the same in both the deposition and trial cannot be disputed. Thus, the only question remaining on whether the deposition was admissible under § 27-804(2)(a) is whether Harman had the *opportunity* to develop Silverheels' testimony through cross-examination when Silverheels refused to answer the questions we have outlined earlier. The district court's ruling was that Harman's counsel did not.

Because we find it clear that Silverheels' deposition was admissible under § 27-804(2)(a) and rule 32 *unless* the opportunity to cross-examine was unduly denied, an analysis of cases dealing with the effect of a witness' refusal to answer questions during cross-examination must be undertaken to determine whether the deposition was admissible in whole or in part despite the fact that Silverheels did not answer all questions put to him on cross-examination.

In a somewhat similar case involving the use of deposition testimony at trial, *U.S. v. Salim*, 855 F.2d 944 (2d Cir. 1988), a government witness refused to answer certain questions on cross-examination in her deposition, and her lawyer answered other cross-examination questions for her. The witness was deposed in France, where she was being held in custody by French police for drug smuggling. The deposition was taken pursuant to French law. The prosecution successfully introduced the deposition under Fed. R. Evid. 804(b)(1), which is essentially the same as our § 27-804(2)(a). On appeal, the defendant argued that the witness' refusal to answer certain questions denied him the opportunity for cross-examination in violation of the Confrontation Clause. The court of appeals held that "[a]lthough [the witness] failed to answer some questions, and although her lawyer responded to a few others on [her] behalf, those flaws did not render the testimony inherently unre-

liable. Rather, they affected the weight to be accorded to the witness' answers, which was a question for the trier of fact." 855 F.2d at 955.

Additionally, the U.S. Court of Appeals for the Eighth Circuit has held that under the federal equivalent to § 27-804(2)(a), opportunity and motive to cross-examine the witness are the important factors, not the actual extent of cross-examination. See *DeLuryea v. Winthrop Laboratories, Etc.*, 697 F.2d 222 (8th Cir. 1983).

■ The seminal case on the issue of the effect of a witness' refusal to answer questions during cross-examination is *United States v. Cardillo*, 316 F.2d 606 (2d Cir. 1963), *cert. denied* 375 U.S. 822, 84 S. Ct. 60, 11 L. Ed. 2d 55. In *Cardillo*, a government witness invoked his privilege against self-incrimination on cross-examination. He had testified on direct examination that he had given the defendant money to buy stolen furs, but on cross-examination, he refused to answer questions about the source of that money. The court set forth three categories to consider in determining whether a witness' failure to answer questions on cross-examination requires striking all or part of his testimony. The court described these categories as follows:

> The first would be one in which the answer would have been so closely related to the commission of the crime that the entire testimony of the witness should be stricken. The second would be a situation in which the subject matter of the testimony was connected solely with one phase of the case in which event a partial striking might suffice. The third would involve collateral matters or cumulative testimony concerning credibility which would not require a direction to strike and which could be handled (in a jury case) by the judge's charge if questions as to the weight to be ascribed to such testimony arose.

*Id.* at 613. In *Cardillo*, the court struck the entire testimony of this witness because the questions the witness refused to answer fell into the first category of testimony.

■ A different government witness in *Cardillo* had testified about the specifics of the crimes attributable to the defendant and then also refused to answer certain questions on cross-examination. However, the questions this witness refused to

answer were about the current charges pending against this witness and his past criminal record. The court first noted that

> reversal need not result from every limitation of permissible cross-examination and a witness' testimony may, in some cases, be used against a defendant, even though the witness invokes his privilege against self-incrimination during cross-examination. In determining whether the testimony of a witness who invokes the privilege . . . may be used against the defendant, a distinction must be drawn between cases in which the assertion of the privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination. Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him.

*Id.* at 611. The court then held that the district court did not err in refusing to strike the testimony of this witness, because the questions he refused to answer "related solely to his credibility as a witness and had no relation to the subject matter of his direct examination." *Id.*

The *Cardillo* analysis and rules have been applied in civil trials as well. In *Board of Trustees v. Hartman,* 246 Cal. App. 2d 756, 55 Cal. Rptr. 144 (1966), a witness, by deposition, refused to answer certain questions on cross-examination. The defendant was a professor who was challenging his firing for violating the education code's provisions for moral fitness because he had helped a former student obtain a divorce in Mexico and then married the student in Mexico the same day. He had also previously been involved with a woman named Frances, with whom he had lived while married to another woman. At trial, the plaintiff sought to introduce the deposition testimony of Frances, who was outside the state at the time of trial. The defendant objected because Frances had refused to answer certain questions on cross-examination about whether she had blackmailed the defendant. After quoting from *Cardillo*, the court held that because the testimony was cumulative and only

related to the credibility of the witness, it was not error to refuse to strike the testimony.

Another civil case, *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489 (2d Cir. 1985), involved stockholders suing for breach of a contract to purchase their stock. On appeal after a plaintiffs' verdict, the defendant argued that the district court erred in allowing one of the plaintiffs to invoke his Fifth Amendment privilege in response to questions asked on cross-examination concerning his alleged nonpayment of Belgium income taxes. After noting that "[o]nly if the alleged error was prejudicial may we find it an adequate basis for reversal," the court held:

> Issues concerning a party's credibility are generally collateral. *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir. 1963). While it is true that a plaintiff may not attempt to deny defendants all opportunities to obtain potentially damaging information, assertion of the privilege against self-incrimination in response to questions on collateral issues is not improper. [Citations omitted.] Where evidence sought on cross-examination relates only to credibility, a party may invoke the privilege against self-incrimination. . . .
>
> . . . Therefore, we hold that the district court did not abuse its discretion in allowing [the witness] to invoke his Fifth Amendment privilege.

*Id.* at 496. But see *Magyar v. United Fire Ins. Co.*, 811 F.2d 1330 (9th Cir. 1987) (district court did not abuse its discretion in striking plaintiff's testimony as sanction for giving nonresponsive and evasive answers), *cert. denied* 484 U.S. 851, 108 S. Ct. 151, 98 L. Ed. 2d 107. The Nebraska Supreme Court has followed the *Cardillo* rule in *State v. Bittner*, 188 Neb. 298, 196 N.W.2d 186 (1972), where the defendant claimed his right to confrontation was denied when the trial court apparently upheld a self-incrimination claim when questions were asked about whether a witness had engaged in prostitution. The *Bittner* court held: "The restricted questioning dealt only with a collateral matter bearing solely on the credibility of the witness, not upon facts brought out on direct examination, and not on facts pertaining to the guilt or innocence of the defendant." *Id.* at 301-02, 196 N.W.2d at 189.

Additionally, "[t]he test [e]nunciated in *Cardillo* has been followed by nearly all federal circuits and the courts of most states." *Tyler v. State*, 105 Md. App. 495, 589, 660 A.2d 986, 1032 (1995) (Davis, J., dissenting) (rejecting court's holding that prior testimony of codefendant was admissible at defendant's trial where codefendant was unavailable for cross-examination), *rev'd on other grounds* 342 Md. 766, 679 A.2d 1127 (1996).

Although the cases involving this issue frequently arise from the assertion of the Fifth Amendment privilege against self-incrimination, it does not appear that assertion of the privilege is a prerequisite to the admission of the deposition testimony when there are unanswered cross-examination questions. See *U.S. v. Negrete-Gonzales*, 966 F.2d 1277 (9th Cir. 1992). Nonetheless, we observe that Silverheels stated: "I refuse to answer any personal questions on the grounds of the Fifth Amendment that it might endanger my family or my property. You better speak to a judge; you are going too far."

We digress to note that Silverheels' statement above is not entirely accurate, because he did not refuse to answer all personal questions. Examination of the deposition reveals that Silverheels answered a good number of personal questions. For example, he provided the name of his corporations in both Nebraska and Oregon, the location of his business and its phone number in Oregon, the name of the person from whom he first heard about Harman's having acquired the rug, the reason why he and his family moved to Oregon, the fact that he had been in the military, his major in college as Indian art and law enforcement, his father's first name and his mother's first name, and the fact that he was formerly a police officer. But, as we have earlier stated, there were questions that Silverheels would not answer in the deposition.

In *Negrete-Gonzales*, the defendants were on trial for conspiring to sell cocaine. The U.S. Court of Appeals for the Ninth Circuit said that if the jury believed the defendants' witness Medina, "it would have had to acquit Negrete and Mendoza on all three counts." *Id.* at 1279. When the government asked her to identify her source of cocaine on cross-examination, Medina refused, stating it would jeopardize the lives of her children.

She would say only that neither Negrete nor Mendoza provided her with the drugs. Based on the refusal to name her source, the court granted the government's motion to strike her entire testimony. The Ninth Circuit, citing its previous decision in *United States v. Lord*, 711 F.2d 887 (9th Cir. 1983), stated that striking a witness' entire testimony is an extreme remedy, not to be lightly imposed. The Ninth Circuit in *Negrete-Gonzales* found that the identity of the unknown supplier was "only peripherally related to [Medina's] direct testimony." 966 F.2d at 1280. The court continued: "The identity of her source was collateral to the issues at trial and to her testimony on direct examination. Any possible relevance to the issues at trial dissipated when she made clear that her supplier was someone other than Mendoza or Negrete." *Id.*

The Ninth Circuit also addressed the role that the witness' reason for refusal to answer plays in the analysis as to whether the testimony should be stricken. The court said:

> Medina, unlike the witness in *Lord*, asserted fear of reprisal rather than her Fifth Amendment privilege as justification for her refusal to answer. Despite this difference, however, we find the *Lord* analysis applicable here. The key question is whether the defendant's right to present witnesses can be protected without frustrating the government's interest in effective cross-examination. A witness's reason for refusing to answer is crucial in determining whether to hold the witness in contempt, but it plays no role in considering whether the cross-examination was frustrated. The right to present witnesses is obviously not unlimited, but the rule distinguishing between collateral and direct issues properly limits it. *Cf. Panza*, 612 F.2d at 436-39 (suggesting without deciding that a nonprivileged refusal to answer does not justify striking a witness's entire testimony if the questioning pertained only to collateral matters).

*Id.*

Medina's testimony in *Negrete-Gonzales* was not cumulative of other witnesses, and the court described her as a key witness and stated that no other witness could duplicate her testimony. Although the court recognized that the jury could have disbe-

lieved Medina, the error in striking her testimony was not harmless, as the jury was not given the opportunity to consider her testimony.

In the instant case, the trial judge's ruling excluding Silverheels' deposition cited two fundamental reasons: (1) The credibility of the deponent was highly relevant and the unanswered inquiries did not relate to merely collateral matters, and (2) the defense counsel was "deprived of a fair opportunity on cross-examination to test the truth of the deponent's direct examination." In judging the correctness of that ruling, we necessarily consider the subject of confrontation of witnesses on cross-examination. In that regard, the Supreme Court's opinion in *State v. Privat*, 251 Neb. 233, 556 N.W.2d 29 (1996), is helpful. The court relied on a series of cases to reach its holding that an accused's constitutional right of confrontation is violated when either

> (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, or (2) a reasonable jury would have received a significantly different impression of the witness' credibility had counsel been permitted to pursue his or her proposed line of cross-examination.

*Id.* at 248, 556 N.W.2d at 38. This holding is of great significance in our analysis of the trial court's conclusion that Harman's counsel was denied a fair opportunity to test the truth of Silverheels' direct testimony.

The court in *Privat* cited *State v. Hartmann*, 239 Neb. 300, 476 N.W.2d 209 (1991), as an example of the denial of the opportunity to cross-examine when the trial court wrongfully refused to allow inquiry into a witness' pending civil lawsuit against the defendant. In *Hartmann*, the pending lawsuit obviously related to the interest and bias of the witness against the defendant, thereby bringing the matter squarely within the *Privat* holding. However, in *State v. Roenfeldt*, 241 Neb. 30, 486 N.W.2d 197 (1992), the Supreme Court upheld the trial court's rejection of a discovery plan to depose a sexual assault victim's grade school principal about an incident involving a missing watch and the assault victim's "untruthfulness" about the

whereabouts of this watch. *Id.* at 38, 486 N.W.2d at 203. The *Roenfeldt* court reasoned that the line of discovery was "clearly collateral" to the criminal behavior at hand and did nothing to exculpate the defendant. *Id.*

The law is well established that when the object of cross-examination is to collaterally ascertain the accuracy or credibility of a witness, some latitude should be permitted; the scope of such latitude is ordinarily subject to the discretion of the trial judge, and unless abused, such exercise is not reversible error. *State v. Lewis*, 241 Neb. 334, 488 N.W.2d 518 (1992). See, also, *Capps v. Manhart*, 236 Neb. 16, 458 N.W.2d 742 (1990). But the trial court here found that the matters which Silverheels refused to respond to were not collateral.

Therefore, it is necessary to put in place a working definition of the concept of "collateral" evidence on cross-examination. In *State v. Williams*, 219 Neb. 587, 365 N.W.2d 414 (1985), the court said that evidence which does not tend to impeach a witness on a material point and which is not substantive proof of a fact relevant to an issue is properly excluded. The *Williams* court also said that the test of whether a fact inquired of in cross-examination in criminal proceedings is collateral is whether the cross-examining party would be entitled to prove it as part of his case and cited *State v. Zobel*, 192 Neb. 480, 222 N.W.2d 570 (1974). In *Williams*, the charge was breaking and entering, and the State had successfully foreclosed, by a motion in limine, inquiry by the defense into Davis' (the burglary victim's) prior conviction for prostitution. Apparently, Davis had not been truthful about this prior conviction when she testified against Williams at his preliminary hearing. At Williams' trial, defense counsel sought to recall Davis, after the State's case, to secure her admission that she had perjured herself at the preliminary hearing. The trial court refused to allow it, and the Supreme Court affirmed. The court found that reference in any form to Davis' alleged prostitution was "properly excluded . . . as an attempted inquiry into a collateral matter." 219 Neb. at 591, 365 N.W.2d at 417. The court further said that it was not substantive proof of any fact relative to the breaking and entering charge against Williams. The fact that Davis' false denial of prostitution may have occurred under oath

during a preliminary hearing did not alter the court's conclusion that any reference to her alleged prostitution was properly excluded as an attempted inquiry into a collateral matter.

The rule is not limited to cross-examination in criminal cases. In *Capps v. Manhart*, 236 Neb. 16, 458 N.W.2d 742 (1990), a dental malpractice case involving alleged improper treatment by use of calcium hydroxide, the counsel for the plaintiff sought to ask an expert witness for the defendant dentist if the witness had patients sign a release before he performed calcium hydroxide therapy for periodontal disease. The objection to the questions about patients' signing releases was sustained at trial and upheld on appeal by the Supreme Court. The court in *Capps* cited the *Williams* rule that evidence which does not tend to impeach a witness on a material point and which is not substantive proof of any fact relating to an issue is properly excluded. The *Capps* court reasoned: "Whether Dr. Nalbor's office practice included having patients sign a release has no bearing on whether Dr. Manhart breached the standard of care in his treatment of appellant." *Id.* at 21, 458 N.W.2d at 746.

An illustration of the limitations upon inquiry into collateral matters is the prohibition against questioning about the precise crime or its details, even though the fact of a felony conviction is properly used as impeachment under Neb. Rev. Stat. § 27-609 (Reissue 1995). See, *State v. Olsan*, 231 Neb. 214, 436 N.W.2d 128 (1989); *Latham v. State*, 152 Neb. 113, 40 N.W.2d 522 (1949) (restriction on inquiry into details of convictions prior to enactment of Nebraska rules of evidence).

In *Latham*, the court held:

> The defendant on cross-examination was asked about matters collateral and immaterial to the issues in the case, and the State was permitted to introduce evidence to disprove what the defendant had said the facts were. This was improper procedure. The apparent purpose of such questions by the State was to lay a foundation for an impeachment argument to the jury based upon false testimony with respect to immaterial matters to prove the defendant unworthy of belief in other matters testified to by him vital to his liberty. When a witness is cross-examined on a matter collateral to the issue, he cannot as to his

answer be subsequently contradicted by the party putting the question.

152 Neb. at 116-17, 40 N.W.2d at 524-25.

As we read Silverheels' deposition and Harman's brief arguing that it was properly excluded, it appears that the foregoing quote is an accurate description of what Harman's counsel was seeking to do with the unanswered questions and why the deposition was allegedly properly excluded. Thus, in applying the body of law we have detailed to the case at hand, our first inquiry is whether the questions Silverheels refused to answer were collateral or whether they were related to the subject matter of his direct examination.

Recalling our listing of the questions, questions 1 through 10 are clearly collateral, as they deal with Silverheels' family and his personal background, which is not related or material to the issues in the case or to his direct testimony. Materiality as a component of determining admissible evidence looks to the relation between the propositions for which the evidence is offered and the issues in the case. *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). This concept of materiality should be used in the analysis of this issue. Where Silverheels went to high school or the last names of his parents are not related to the general subject of whether Harman took advantage of Burke or to the specific question of whether Silverheels had the conversation with Harman that he related on direct examination.

Questions 12 through 14, regarding statements which he allegedly made about who was a relative, being a lawyer in California, and being the chief of an Indian tribe, are also collateral. We cannot even know if Silverheels' credibility is involved, because he did not answer, and thus, there are no prior inconsistent statements. We must be mindful of the difference between simply not answering, as happened here, and providing an answer which is inconsistent with a prior statement. Harman did not move to compel answers from Silverheels. (In this regard, we note Oregon Rules of Civil Procedure, which through rule 46A(1)(a) and 46A(2) provide a procedure to seek an order of an Oregon court compelling a witness to answer, including the awarding of expenses under rule 46A(4) for a successful motion. Rule 46B provides for sanctions for a refusal to

answer, including contempt. Rule 38C provides that the foregoing rules are applicable to foreign depositions, which would include those taken in Oregon upon notice or agreement in a Nebraska lawsuit.)

Question 15, about other pending lawsuits involving Silverheels, is also collateral in nature, absent a showing that Burke or Harman was also involved in such cases. Had that been the case, counsel for Harman could have used leading questions, as was his right, to demonstrate for the trial court, and us, why the question had materiality and went to Silverheels' bias or interest. But that was not done. Questions 16 and 17, about Silverheels' legal name, when he acquired that name, and whether he had used another name, are also collateral—unless counsel sought to explore felony convictions under another name. But no question about prior felonies was asked, irrespective of the name at the time of conviction. Thus, questions 16 and 17 are collateral. The answers to these questions, had they been given, tend to prove nothing about whether Silverheels had the conversations he testified to with Harman.

The answer to question 18, about the significance of June 6, 1980, the date before which Silverheels said he would not provide personal information (even though he did provide some prior information), may well be interesting, but on its face as asked, it does not relate to whether he and Harman discussed a Navajo weaving 13 years later. The name of his shop in Arizona, asked in question 19, may allow the cross-examiner to track down some more information about Silverheels, his reputation, and his knowledge of Indian artifacts. But Silverheels' testimony was not offered as expert testimony on identification or value of weavings. His testimony is merely that of a person who claims to have had a conversation with Harman in which admissions against Harman's interest were allegedly made. However, the fact that Silverheels would hide the name of his business, presumably open to the public, is a fact from which a jury could gain a different view of Silverheels' credibility, and thus, an answer is really not needed to give the jury a negative impression about Silverheels' credibility. The lack of an answer is probably of more benefit than an answer, because to introduce evidence of negative details of Silverheels' Arizona busi-

ness would require Harman to overcome the prohibition against introduction of contradictory evidence on collateral matters. We view Silverheels' reluctance to discuss his ethnicity in question 20, given that he claims to be a dealer in Native American art, to be curious, but the refusal to answer again inures more to Harman's benefit in how a jury would judge Silverheels' credibility than if he had simply said, "I am a member of the Apache Tribe."

When we assess whether the unanswered questions are collateral and the trial court's order excluding all of the testimony, we posit the hypothetical of what would happen if Silverheels had answered, for example, that he was an Apache and then Harman sought to prove at trial by other witnesses that Silverheels was not an Apache (therefore making him generally not credible by inference) because he had been raised on the Crow Indian Reservation in eastern Montana. Is Burke then allowed to counter with testimony from Silverheels' grandmother that she is an Apache and that her grandson is one-eighth Crow and seven-eighths Apache, which makes him an Apache under tribal tradition and law, just as he testified? We believe that the rule against impeachment of a witness by producing extrinsic evidence of collateral facts to contradict the witness' assertions, see *McCune v. Neitzel*, 235 Neb. 754, 457 N.W.2d 803 (1990), prevents this from turning into a series of minitrials about whether Silverheels is an Indian chief or is Tonto's grandson. In the analysis of whether the unanswered questions were collateral and whether exclusion of the entire deposition was appropriate, the trial judge should "self-inquire" as to what he or she would do if all the questions were answered, but Harman wanted to call other witnesses to establish that each answer was a lie. If the testimony of such witnesses would be excluded by the *McCune* rule cited above, then the questions posed at the deposition are necessarily collateral and refusal to answer them does not justify exclusion of Silverheels' entire deposition under *United States v. Cardillo*, 316 F.2d 606 (2d Cir. 1963), *cert. denied* 375 U.S. 822, 84 S. Ct. 60, 11 L. Ed. 2d 55.

We are, of course, willing to readily concede that the unanswered questions are potentially important background questions to which a lawyer engaged in discovery and trial prepara-

tion would like to have answers for followup investigation or additional discovery. However, this is not a discovery issue, but, rather, one of the wholesale exclusion of a witness' testimony. The questions are collateral because they do not relate to the substance of his direct examination. See, also, *Commonwealth v. Dwyer*, 10 Mass. App. 707, 412 N.E.2d 361 (1980) (questions witness refused to answer were attack on his general credibility and as such were collateral). The issue for the trial judge was not whether the unanswered questions were good discovery questions, but, rather, were they of such materiality that the refusal to answer them justified excluding all of the witness' testimony. We hold that Silverheels' refusal to answer the listed questions falls into the third *Cardillo* category, which "would not require a direction to strike and which could be handled . . . by the judge's charge" about the weight to be accorded Silverheels' testimony. See 316 F.2d at 613. See *State v. Grubbs*, 117 Ariz. 116, 570 P.2d 1289 (Ariz. App. 1977), and *People v. Siegel*, 87 N.Y.2d 536, 663 N.E.2d 872, 640 N.Y.S.2d 831 (1995), for examples of such jury instructions. In *Grubbs*, the trial court instructed: " 'In determining the credibility of the testimony of such witnesses, you may consider the failure or refusal of such witness to respond to Cross-Examination.' " 117 Ariz. at 119, 570 P.2d at 1292. The Arizona appellate court approved the instruction, finding that the unanswered question did not deny the appellant's counsel an ample opportunity to test the knowledge of the witness.

We note that Silverheels did not refuse to answer any questions bearing on his relationship with either Burke or Harman, nor did he refuse to answer any questions regarding the series of events surrounding the acquisition and selling of the weaving. Harman was not denied the opportunity to cross-examine Silverheels with regard to any matter of substance from his direct examination.

Every question Harman's counsel asked Silverheels about his conversations with Burke and Harman and about the subject weaving was answered. These are the questions which would properly be characterized under *Cardillo* as "so closely related" to the subject of the case that the entire testimony of Silverheels should have been stricken if he had refused to answer. See 316

F.2d at 613. Instead, the questions Silverheels refused to answer were collateral matters. Thus, under *Cardillo,* all of Silverheels' testimony should not have been excluded, and the district court abused its discretion in excluding all of Silverheels' testimony. See, also, *United States v. Lord,* 711 F.2d 887 (9th Cir. 1983) (questions about witness' supplier of cocaine were collateral matter, and district judge abused discretion in striking all of witness' testimony; however, error was harmless in light of other evidence).

The importance to Burke of Silverheels' testimony is obvious. Silverheels' testimony, if believed by the jury, tends to show that Harman had "suckered" Burke into selling the weaving for $1,000 by telling him that it was Mexican, when Harman knew it was not. The testimony of Silverheels, if believed, is supportive of Burke's testimony. The deposition testimony also tends to show that Harman had made several inquiries about first, second, and third phase weavings before the transaction with Burke took place, which is relevant on Harman's prior knowledge and interest in Navajo weavings. The district court abused its discretion in excluding all of Silverheels' testimony. Silverheels' refusal to answer the collateral questions, even if they related somehow to his credibility, was at most only grounds for an instruction to the jury to consider his refusal to answer when judging his credibility. See, *Grubbs, supra*; *Siegel, supra.*

Harman argues that the witness "had attempted to foreclose any potential impeachment on such things as a dishonorable military discharge, felony convictions, or any other information that might reflect negatively upon his credibility." Brief for appellee at 33. However, Silverheels was not asked on cross-examination whether he had felony convictions or if he had been dishonorably discharged. When the questions are not asked, there cannot be any denial of the right to cross-examination. While the right of cross-examination is fundamental, a ruling on evidence of a collateral matter intended to affect the credibility of a witness falls within the discretion of the trial court. *Capps v. Manhart*, 236 Neb. 16, 458 N.W.2d 742 (1990).

In *L. J. Vontz Constr. Co. v. Alliance Indus.*, 215 Neb. 268, 272, 338 N.W.2d 60, 62 (1983), the Nebraska Supreme Court held:

> A party has the right to cross-examine the witnesses produced by his adversary touching every relation tending to show their interest or bias. A party has the right to cross-examine a witness with regard to an interest which affects credibility. Failure to permit such inquiry constitutes reversible error if prejudice results to the complaining party. *Hegarty v. Campbell Soup Co.*, 214 Neb. 716, 335 N.W.2d 758 (1983).

Neither the record made on the motion in limine nor Harman's brief informs us how the unanswered questions related to Silverheels' credibility, interest, or bias. The questions appear to be, at most, the sort of "fishing" that lawyers do in pretrial depositions.

The district court's conclusion that "defense counsel was deprived of a fair opportunity on cross-examination to test the truth of the deponent's direct examination" has a faulty premise, because none of the questions which Silverheels declined to answer went to Silverheels' direct testimony or his interest or bias in the case—the unanswered questions were all about collateral matters. Under these circumstances, the trial court's remedy of refusing to admit Silverheels' deposition was an abuse of discretion, which operated to Burke's prejudice.

*Failure to Submit Negligent Misrepresentation to Jury.*

At the close of Burke's case, Harman's counsel made a motion for a directed verdict on the ground that "the type of expectancy or loss [sic] profit damages which plaintiff seeks are not recoverable under Nebraska law under a theory of negligent misrepresentation." Following the motion, there was an extensive on-the-record discussion among counsel and the court about damages recoverable under negligent misrepresentation. Burke argued that under either negligent misrepresentation or fraudulent misrepresentation, the damages were the difference in value between what Harman paid for the blanket and the fair market value of the blanket at the time. The record establishes

that the parties stipulated that $290,000 was the blanket's fair market value at the time of the sale by Burke to Harman.

Harman's position was that the Nebraska Supreme Court had adopted the Restatement (Second) of Torts § 552 (1977) with respect to negligent misrepresentation in *Gibb v. Citicorp Mortgage, Inc.*, 246 Neb. 355, 518 N.W.2d 910 (1994); that in fraudulent misrepresentation cases, one was entitled to profits, i.e., expectancies; that in mere negligent misrepresentation cases, the law limits recovery to "out-of-pocket"; and that the plaintiff is "not going to get you the profits you would have made if you hadn't been injured." After ascertaining from Burke's counsel that there was no claim except de minimis for out-of-pocket expenses, the court granted Harman's motion for a directed verdict on the theory of negligent misrepresentation, and the case was submitted to the jury only on fraudulent misrepresentation.

*Gibb* articulates that liability for negligent misrepresentation is based upon the failure of the actor to exercise reasonable care or competence in supplying correct information. The *Gibb* opinion quotes the Restatement of Torts, § 552:

> "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

246 Neb. at 370, 518 N.W.2d at 921.

We have not found a Nebraska case which discusses the matter of the type of damages recoverable for the tort of negligent misrepresentation. However, the issue of recoverable damages under that theory is covered in the Restatement.

The matter of damages takes a bit of a tortured path through the Restatement. Section 552 outlines the basic requirements of the theory of recovery for negligent misrepresentation, and we have no doubt that the portion of § 552 quoted above from *Gibb* encompasses Burke's claim against Harman. Harman clearly had a pecuniary interest in the transaction.

Section 552 B(1) at 140 sets forth the damages for negligent misrepresentation and provides:

> (1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including
>
> (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
>
> (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

Section 552 B(2) at 140 excludes damages for "the benefit of the plaintiff's contract with the defendant." In § 552 B, comment *a.* at 141, we are referred to the Restatement (Second) of Torts § 549(1) (1977), as the comment states:

> The rule stated in this Section applies, as the measure of damages for negligent misrepresentation, the rule of out-of-pocket loss that is stated as to fraudulent misrepresentations in Subsection (1) of § 549. Comments *a* to *f* under § 549 are therefore applicable to this Section so far as they are pertinent.

Section 549 at 108, entitled "Measure of Damages for Fraudulent Misrepresentation," states:

> (1) The recipient of a fraudulent misrepresentation is entitled to recover his damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including
>
> (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
>
> (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.

It is, of course, important to remember that although this section defines recoverable damages for fraudulent misrepresentation, § 552 B "borrows" § 549(1) for the measure of damages for negligent misrepresentation.

Section 549(1), comment *a.* at 109, states that the most usual loss "is when the falsity of the representation causes the article bought, sold or exchanged to be regarded as of greater or less

value than that which it would be regarded as having if the truth were known." In the context of negligent misrepresentation, it is not whether the truth is known, but, rather, whether reasonable care or competence was exercised in obtaining or communicating the information which forms the alleged misrepresentation. In this case, under Burke's evidence, the alleged misrepresentation is what Harman said the blanket was and what it was worth.

The fact that Burke is the seller and the alleged recipient of the fraudulent or negligent misrepresentation is not of consequence. See *Heise et ux v. Pilot Rock Lbr. Co.*, 222 Or. 78, 352 P.2d 1072 (1960) (seller's action against buyer for fraudulent misrepresentation and concealment which allegedly induced them to sell timber on land for less than true value). See, also, *Hanners v. Balfour Guthrie, Inc.*, 564 So. 2d 412 (Ala. 1990); *Armel v. Crewick*, 71 N.J. Super. 213, 176 A.2d 532 (1961); and *Allied Sound, Inc. v. Neeley*, 909 S.W.2d 815 (Tenn. App. 1995); (all seller against buyer cases).

The commentary to § 552 B of the Restatement adopts the out-of-pocket rule as the appropriate measure of damages for negligent misrepresentation and specifically excludes benefit of bargain damages. *Trytko v. Hubbell, Inc.*, 28 F.3d 715 (7th Cir. 1994). *Trytko* involved a claim based upon the alleged misstatement of the expiration dates of stock options held by an employee, and a jury verdict for negligent misrepresentation was returned. The Seventh Circuit Court of Appeals held that Indiana would recognize the tort of negligent misrepresentation and that the measure of damages was the employee's out-of-pocket losses. The *Trytko* court cites W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 10 (5th ed. 1984), to explain the crucial difference between these different measurements of damages as follows: "The out-of-pocket rule 'looks to the loss which the plaintiff has suffered in the transaction, and gives him the difference between the value of what he has parted with and the value of what he has received.' " 28 F.3d at 722. *W.K.T. Distributing Co. v. Sharp Electronics*, 746 F.2d 1333, 1337 (8th Cir. 1984), explained that "[t]he loss is usually measured as the difference between what the plaintiff parted with and what the plaintiff received." In contrast, the benefit of the bargain rule "gives the plaintiff the benefit of

what he was promised, and allows recovery of the difference between the actual value of what he has received and the value that it would have had if it had been as represented." Keeton et al., *supra*, § 10 at 768.

Admittedly, the difference between "out-of-pocket" and "benefit of the bargain" may seem amorphous. The *Trytko* opinion seeks to articulate the difference by discussing *Gediman v. Anheuser Busch, Inc.*, 299 F.2d 537 (2d Cir. 1962), where the plaintiff, confused over the range of benefits available under his employer's retirement plan, asked the employer which option would provide him with the most favorable treatment, but the employer negligently informed him that a certain benefit package was optimal, when in reality the plaintiff would have been significantly better off under a different package. In *Gediman*, the court found liability for negligent misrepresentation under § 552 of the Restatement and awarded damages equal to the difference between the value of the benefit plaintiff would have selected and the value of the plan he did select. The Ninth Circuit later explained the damage award in *Gediman* in *Cunha v. Ward Foods, Inc.*, 804 F.2d 1418 (9th Cir. 1986), in an opinion which concludes that Hawaii would follow § 552B of the Restatement and award only out-of-pocket damages in negligent misrepresentation cases. The *Cunha* case says that the damage award in *Gediman*

> does not represent benefit-of-the-bargain damages, i.e., the difference between what the plaintiff *expected* he would receive, had the defendant's representations been true, and the amount *actually received* under that option. Instead, he was awarded the difference between the value parted with at the time of the misrepresentation, and the value of what he received in return.

(Emphasis in original.) 804 F.2d at 1426.

Accepting the truth of Burke's evidence, as we must, given that we are addressing the sustaining of a motion for a directed verdict, the quote from *Cunha* above describes exactly the situation presented by Burke's evidence. Burke seeks $289,000, which is the difference between the value parted with at the time of the misrepresentation (it is crucial here to recall the parties' stipulation that on August 1, 1993, the blanket had a "fair

market value of $290,000") and the value of what he received in return, $1,000 in cash. In fact, in this connection, we again observe that on the fraudulent misrepresentation claim, the court instructed the jury that if it found for Burke, it must return a verdict of $289,000. In short, the trial court directed what the amount of a verdict would be—a finding as a matter of law as to Burke's out-of-pocket damages—should liability on fraudulent misrepresentation be found.

The *Trytko* opinion also refers at length to *Lewis v. Citizens Agency of Madelia, Inc.*, 306 Minn. 194, 235 N.W.2d 831 (1975), where a defendant insurance agent negligently represented to a wife that her husband (before his death) had earlier purchased a life insurance policy when it was actually an annuity. The court awarded damages in the amount of the death benefit of the nonexistent insurance policy, because according to the court in *Trytko*, the plaintiff "forewent purchasing alternative or additional insurance on the basis of defendant's misrepresentations." *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 723 (7th Cir. 1994). The *Trytko* court then succinctly continued its delineation of "benefit-of-the-bargain" versus "out-of-pocket."

> In one sense, measuring plaintiff's recovery by what she had been assured existed seems to award her the benefit of a hypothetical bargain to buy life insurance. But, in fact, the misrepresentation in *Lewis* did not lead the plaintiff into a bargain which she sought to enforce. Rather, the misrepresentation caused her to forego something valuable, which, happenstantially, was a "bargain". *Its* benefit is not what § 552B(2) bars from recovery. § 552B(2) only directs that a plaintiff is not entitled to recover for expectancy created by the defendant's negligent misrepresentations—i.e., the benefit of a negligently described and induced bargain. But while expectations negligently created are not recoverable, benefits foregone as a result of such expectations are. Illustrations from the Restatement make clear that reliance is recoverable and expectancy is not; but reliance is fully recoverable even when it matches expectancy.

*Id.*

The court in *Trytko* concluded its discussion by summing up that the limitation on benefit of bargain damages refers to the expectancy damages caused when a misrepresentation underlies a bargain or that, in other words, "benefit-of-the-bargain damages arise only where the misrepresentation created an expectancy. The plaintiff is not entitled to recover the expectancy described or contemplated by the misrepresentation because it was not a real loss suffered." *Id.* at 724.

While applying these concepts to the instant case, and importantly remembering the stipulation that the blanket had a fair market value of $290,000 on August 1, 1993, it is clear to us that the damages sought are not benefit of the bargain, but, rather, are a real loss. Burke walked into Harman's house with a blanket, which, by stipulation, was worth $290,000. He left Harman's house with $1,000 because of a fraudulent or negligent misrepresentation, according to his evidence. Thus, under the parties' stipulation, there is a real loss of $289,000. As stated earlier by the Eighth Circuit in *W.K.T. Distributing Co. v. Sharp Electronics*, 746 F.2d 1333 (8th Cir. 1984), the loss is measured as the difference between what the plaintiff parted with (in this case, a $290,000 Navajo chief's blanket) and what he received ($1,000 cash). Thus, this is not an expectancy claim but a claim for out-of-pocket damage which is recoverable under the Restatement, *supra*, when § 552B (negligent misrepresentation) borrows the measure of damages from § 549(1). Consequently, the district court erred in concluding that Burke's damages were not recoverable under negligent misrepresentation, and thereby, the trial court erred in directing a verdict on that claim and refusing to submit the theory of negligent misrepresentation to the jury. In fact, just as the trial court determined on fraudulent misrepresentation, Burke's damages on negligent misrepresentation, if he prevailed, would be $289,000 as a matter of law, because of the stipulation.

*Rebuttal Witness.*

As we have previously detailed in this opinion, there was sharp conflict on the time of day that the meeting between Burke and Harman took place. The importance of that fact relates to Burke's circumstantially proving what Harman knew

about the blanket and when he knew it, as well as proving what actions Harman took immediately after acquiring the blanket. Burke sought to introduce the testimony of two witnesses on rebuttal to establish that the meeting could not have occurred at the time Harman and his wife said it did, because Burke was otherwise occupied by his attendance at an anniversary celebration lasting the entire afternoon of August 1, 1993. The court sustained Harman's objection to the rebuttal witness, Judy Pennington, who according to the offer of proof, would testify to Burke's attendance during the entire afternoon of August 1 at an anniversary celebration. The court ruled that this was improper rebuttal. The district court has a degree of latitude with respect to the admission of evidence in rebuttal. See *Westgate Rec. Assn. v. Papio-Missouri River NRD*, 250 Neb. 10, 547 N.W.2d 484 (1996). However, given the reversal, and the remand for new trial in this cause, we need not decide this assignment of error, as it is unlikely to recur at retrial.

*Jury Instruction—Deposition.*

Burke assigns error concerning the inadvertent playing of a portion of a deposition which had been ruled inadmissible and which prompted a request for a specific admonition in jury instructions. Because a retrial is necessary, and this seems unlikely to recur, we see no need to discuss it further.

*Jury Instruction—Forms of False Representation.*

At trial, Burke proposed an instruction pursuant to NJI2d Civ. 15.23, "Forms of False Representation," which was refused by the trial court. This instruction indicates that a false or fraudulent misrepresentation may take three forms, including a person's failure to disclose a fact known to him when

(b) [he] knows that disclosure would correct the other party's mistake as to a basic assumption on which that other party is making the contract and where such nondisclosure amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing; or

. . . .

(d) The other person is entitled to know the fact because of a relation of trust and confidence between them.

We have not quoted the entire proposed instruction but have focused on the portions which are arguably most directly related to the case. The comment to NJI2d Civ. 15.23 states: "Use only those paragraphs that, in light of the pleadings and the evidence, will assist the jury." Burke asserts that the importance of the instruction was that it addresses the fact that "failure to disclose is as significant as an affirmative misstatement." Brief for appellant at 31.

The difficulty with Burke's argument is that the lawsuit, viewing the evidence from Burke's standpoint, is not a failure to disclose case, but, rather, an affirmative misrepresentation case. In other words, Burke's evidence and theory of the lawsuit was that Harman told him that it was a Mexican blanket when Harman knew that it was not, or should have taken more care before making this statement. The instruction quoted above which Burke now argues should have been given is applicable, if at all, in the case of a failure to disclose rather than a case of affirmative misrepresentation.

Burke also argues that his proposed instruction that he was justified in relying upon an assertion of opinion by Harman if Burke stands in a relation of trust and confidence to Harman or Burke reasonably believes that as compared with himself, Harman, whose opinion is asserted, has special judgment, skill, or objectivity with respect to the subject matter. This instruction is derived from the Restatement (Second) of Contracts § 169 (1981). This is, of course, a tort case. In any event, the fundamental concepts upon which Burke seeks instructions are, in reality, contained in jury instruction No. 7, which provides:

> The recipient of a fraudulent misrepresentation solely of the maker's opinion is not justified in relying upon it in a transaction with the maker, unless the fact to which the opinion relates is material, and the maker (a) purports to have special knowledge of the matter that the recipient does not have, or (b) stands in a fiduciary or other similar relation of trust and confidence to the recipient, or (c) has successfully endeavored to secure the confidence of the recipient, or (d) has some other special reason to expect that the recipient will rely on his opinion.

The category delineated in (d) is quite expansive and would include the situation involved here, where Burke contacted Harman to look at a weaving for the express purpose, admitted by Harman's testimony, of determining "what it is." Therefore, Burke's assignments of error concerning these aspects of the instructions are without merit.

*Cross-Appeal.*

Harman cross-appeals with respect to a discovery matter because the trial court failed to impose attorney fees on Burke's counsel for his alleged "abuse of the discovery process." The cross-appeal arises out of the issuance of a subpoena duces tecum at the instance of Burke's attorney. A paralegal from the office of Burke's attorney directed a letter to a court reporter requesting the reporter to do a deposition duces tecum for the custodian of records of Lincoln Telephone and Telegraph (LTT) for Harman's telephone records, including long distance, from July 1, 1993, through August 1, 1994. The letter advises the court reporter: "You can choose an appropriate date and they can send them to our office by that date in lieu of appearing." The reporter issued the subpoena duces tecum as requested and set a deposition date for 10 a.m. on January 30, 1995, and then included the following advice to LTT: "You may comply with this Subpoena Duces Tecum and waive your personal appearance by providing copies of the above-requested records, together with any billing for the same, on or before January 27, 1995 to Mr. Charles H. Wagner, Attorney at Law, P.O. Box 277, Wahoo, NE 68066." An employee of LTT wrote to Burke's attorney, Wagner, indicating that the records would be forthcoming by January 27. Wagner conceded that he received copies of the records from LTT but that no deposition notice was ever served on Harman's attorney advising that the procurement of these records was occurring.

Nebraska Ct. R. of Discovery 30(b)(1)(A) (rev. 1996) provides that a "party desiring to take the deposition of any person upon oral examination shall give reasonable notice in writing to every other party to the action." By Neb. Ct. R. of Discovery 26(f) (rev. 1996), a copy of the notice must be served on opposing counsel.

Harman argues that providing notice of the deposition allows an individual to move for a protective order or take other action to protect that individual's confidentiality and privacy rights. Harman also argues that Burke's counsel circumvented the requirements of the discovery rules and that we should not tolerate "such a blatant abuse of the discovery process and such a cavalier disregard for the privacy rights of individuals." Brief for appellee at 49.

The response of Burke's attorney is that a paralegal directed the letter to the court reporter, asking the reporter to choose an appropriate date and indicating to LTT that the records could be sent in lieu of an appearance. Neb. Rev. Stat. § 64-108 (Reissue 1996) authorizes a notary to issue the subpoena only after notice of deposition has been deposited with the reporter, but Burke argues that the reporter in this instance issued the subpoena prior to advising counsel of the date selected so that he could then issue notice to Harman's counsel. Moreover, Burke asserts that there is no contention that the records were not discoverable or were subject to any privilege. The trial court granted sanctions by precluding Burke's use of telephone records, except as to those which had otherwise been secured through proper discovery procedures. Burke argues that there was no violation of a court order, no withholding of evidence, and no prejudice to Harman arising from the failure of Burke's counsel to ensure that notice was issued to Harman's counsel before the phone records were secured via discovery deposition.

In *Booth v. Blueberry Hill Restaurants*, 245 Neb. 490, 513 N.W.2d 867 (1994), the court indicated that sanctions under Neb. Ct. R. of Discovery 37 (rev. 1996) exist to punish a litigant or counsel who might be inclined or tend to frustrate the discovery process and that under the rule, the appropriate sanction is to be determined from the factual context of the particular case and is left to the discretion of the trial court, citing *Norquay v. Union Pacific Railroad*, 225 Neb. 527, 407 N.W.2d 146 (1987). The court in *Booth* indicated that the " 'hierarchy of harshness in permissible sanctions under Rule 37' " ranges from reimbursement of expenses incurred as a result of noncompliance to a default judgment. 245 Neb. at 494, 513 N.W.2d at 869.

The district court in this matter ruled that counsel's letter to the court reporter was "quite misleading" and that it was "the duty of counsel to make sure that proper notice is given to the adverse party for any manner of formal discovery, particularly when legal process [subpoena] is involved." The court thus sustained the motion for sanctions to the extent that the phone records acquired pursuant to the subpoena be returned to Harman's counsel and that those records could not be used in this case.

We analyze this matter from the standpoint of whether the court's ruling was an abuse of discretion to the extent that fees should also have been awarded against Burke's counsel. An abuse of discretion is defined as the trial court's ruling being clearly untenable and unfairly depriving the litigant of a substantial right and a just result. *State v. Philipps*, 242 Neb. 894, 496 N.W.2d 874 (1993). The purpose of the discovery process is to enable preparation for trial without the element of an opponent's tactical surprise, a circumstance leading to results based on counsel's legal maneuvering more than on the merits. See *Norquay, supra*. The manner that these telephone records were obtained runs counter to those expressed goals and was improper. We find that the district court's sanction was appropriate, and its refusal to include an award of attorney fees as an additional sanction was not an abuse of discretion. Harman's cross-appeal is denied.

## CONCLUSION

We have found that the district court abused its discretion in finding that Silverheels' deposition should not be received in evidence because the court's reasoning that the unanswered questions were not collateral matters was incorrect. Moreover, Harman's counsel was not deprived of the opportunity to cross-examine the witness about material matters. If admitted, Silverheels' testimony provides support for Burke's theory of the case and buttresses his other evidence. Thus, it was not harmless error. Moreover, the district court erred in failing to submit the theory of negligent misrepresentation to the jury on the basis that such theory only provided for out-of-pocket loss and there was no out-of-pocket loss. Out-of-pocket loss was in

effect stipulated to in the amount of $289,000 and, therefore, existed as a matter of law. The district court imposed an incorrect limitation on recovery for a cause of action involving negligent misrepresentation. Thus, on two grounds, reversal, and a remand for a new trial is required. The other assignments of error do not need to be decided because of the remand. There is no merit to the cross-appeal.

REVERSED AND REMANDED FOR A NEW TRIAL.