**IT IS HEREBY ORDERED** that defendants' motion to dismiss for lack of personal jurisdiction and venue is **DENIED.** [Doc. 17]

**IT IS FURTHER ORDERED** that defendants' alternative motion to transfer venue pursuant to 28 U.S.C. § 1404(a) is **GRANTED.** [Doc. 32]

**IT IS FINALLY ORDERED** that this matter is **TRANSFERRED** to the United States District Court for the Central District of Illinois pursuant to 28 U.S.C. § 1404(a).

OUTLOOK WINDOWS PARTNER-
SHIP, a Nebraska Limited
Partnership, Plaintiff,

v.

YORK INTERNATIONAL CORPORA-
TION d/b/a Natkin Services; Travelers
Property Casualty Insurance Compa-
ny; and UtiliCorp United, Inc., d/b/a
Peoples Natural Gas, Defendants.

No. 4:99CV3108.

United States District Court,
D. Nebraska.

Aug. 21, 2000.

Timothy R. Engler, Shana Q. Wright–Avery, Harding, Shultz Law Firm, Lincoln, NE, for plaintiff.

Andrea D. Snowden, Cline, Williams Law Firm, Lincoln, NE, James M. Bausch, Cline, Williams Law Firm, Omaha, NE, Rex A. Rezac, Fraser, Stryker Law Firm, Omaha, NE, Margaret Hupp Fahey, Clausen, Miller Law Firm, Chicago, IL, Celeste A. Hill, Chicago, IL, John E. Hubbard, Trenton P. Bausch, Megan E. Sebastian, Blackwell, Sanders Law Firm, Omaha, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

This matter is before the court on separate motions for summary judgment filed by the defendants, York International Corporation d/b/a Natkin Services ("Natkin") (filing 56), Travelers Property Casualty Insurance Company ("Travelers") (filing 53), and UtiliCorp United, Inc., d/b/a Peoples Natural Gas ("Peoples") (filing 49). Upon consideration of the pleadings, filed affidavits, and briefs submitted by the parties, I find that the motions filed by Travelers and Peoples should be granted, and that the motion filed by Natkin should be denied. Pursuant to Fed.R.Civ.P. 54(b), final judgment will be entered in favor of Travelers and Peoples.

### I. BACKGROUND

This action was originally filed by the plaintiff, Outlook Windows Partnership, a Nebraska limited partnership ("Outlook"), in the District Court of Lancaster County, Nebraska, but on April 16, 1999, was removed to federal court by the defendant Natkin, based upon diversity of citizenship. It appears that the removal was timely, and that this court has jurisdiction.

The parties' dispute concerns the heating system at Outlook's manufacturing facility. Outlook's wood-fired boiler suffered a "melt-down" in January 1997, which was determined to be a covered loss under an

insurance policy issued by Travelers. In settlement of the claim, Travelers ultimately paid Outlook the purchase price of two gas-fired boilers which were sold and installed by Natkin. Outlook claims that the settlement with Travelers was the result of a mutual mistake concerning the cost of operation of the new gas-fired system, which Outlook erroneously was led to believe, based upon an estimate provided by Natkin and the gas supplier, Peoples, would be about equal to the cost of operation the old wood-fired system. Outlook seeks to recover from the defendants the difference between the actual and estimated cost of operation of the gas-fired system over its useful life or, alternatively, the cost of installing a new wood-fired system.

Outlook's state-court petition contains four causes of action: (1) as against Natkin and Peoples, a claim for fraudulent misrepresentation; (2) also as against Natkin and Peoples, a claim for negligent misrepresentation; (3) as against Natkin only, a claim for breach of implied warranty of fitness for a particular purpose; and (4) as against Travelers only, a claim for breach of contract. Essentially, Outlook contends that it was relying upon each of the defendants to provide it with a replacement heating system that would perform as well as the old system, and for the same cost of operation.

Natkin contends that it cannot be held liable for misrepresentation, whether fraudulent or negligent, because the estimated cost of operation of the gas-fired system was merely an opinion. It further contends that there was no intent to deceive Outlook, and that the estimate pertained to the cost of operation of one gas-fired boiler rather than two, which is the only cost estimate that Outlook requested. (The second gas-fired boiler was added after the first boiler proved inadequate, because of insufficient horsepower, to heat Outlook's building operating by itself.) As to the claim for breach of implied warranty, Natkin contends that it was not aware of any particular purpose when it sold the boilers to Outlook, and that the boilers are fit for their ordinary purpose of providing heat.

Peoples similarly contends that Outlook could not justifiably have relied upon the cost estimate and, in any event, that the estimate was accurate based upon the information that was provided. Peoples disputes that it owed any duty to Outlook to provide a new estimate when the second boiler was added.

Travelers contends that a release executed as part of the insurance claim settlement bars Outlook's breach of contract claim, and that the additional cost of operation of the gas-fired boilers was not wholly unknown at the time the release was executed. Travelers also maintains that it has fully compensated Outlook for its loss in accordance with the plain language of the insurance policy.

As required by NELR 56.1(a), each of the defendants has set forth in its brief a statement of undisputed facts, which are repeated below. Citations to the record have been omitted, except as to those statements (identified by underlining) with which Outlook has expressed some disagreement. Also set forth verbatim below is Outlook's stated position regarding such contested statements of fact.

### A. Natkin's Statement of Undisputed Facts

1. Outlook is a limited partnership duly organized and existing under the laws of the State of Nebraska with its principal place of business in Lincoln, Lancaster County, Nebraska.

2. Natkin is a corporation duly organized and existing under the laws of the State of Delaware and engages in business activities in the State of Nebraska.

3. Travelers Property Casualty Insurance Company ("Travelers") is a corporation duly organized and existing under the laws of the State of Connecticut and engages in business activities in the State of Nebraska.

4. UtiliCorp United, Inc. d/b/a Peoples Natural Gas ("Peoples") is a corporation duly organized and existing under the laws of the State of Delaware and engages in business activities in the State of Nebraska.

5. Craig Anderson ("Anderson") is, and was at all relevant times, CEO of Outlook. As CEO of Outlook, Anderson is responsible for the sales, marketing, financial, production and product design aspects of Outlook's business.

6. Marvin Burbach ("Burbach") is, and was at all relevant times, the manager of Natkin's Lincoln, Nebraska office. As manager of Natkin's Lincoln office, Burbach is responsible for the day-to-day operation of Natkin's business in Lincoln, including doing estimates and project management.

7. William Lucke ("Lucke") is, and was at all relevant times, a consumer market representative for Peoples. As a consumer market representative, Lucke handles customer inquiries and complaints and does estimates of future utility costs for businesses which are relocating, expanding or converting their operations.

8. On or about January 14, 1997, Outlook's old 165 horsepower ("hp") wood-fired boiler, which provided heat to Outlook's facility, failed.

9. After Outlook's wood-fired boiler failed, Outlook contacted Natkin to arrange for temporary heating for Outlook's building.

10. At that time, Outlook and its insurer, Travelers, began considering whether to rent or purchase a gas-fired boiler to provide temporary heat to Outlook's facility until a decision was made as to whether to install a wood-fired or gas-fired boiler on a permanent basis.

11. Also at that time, it was estimated that it would take 12–14 weeks to make delivery of a wood-fired boiler, and that the cost of procuring and installing a wood-fired boiler would be significantly greater than for a gas-fired boiler.

12. In an effort to assist Outlook in providing temporary heat to Outlook's facility, Natkin agreed to attempt to locate a gas-fired boiler that could be immediately installed on Outlook's premises to provide heat on a temporary basis.

13. When Natkin was able to locate a 100hp gas-fired boiler, Travelers directed Natkin to purchase the 100hp gas-fired boiler for temporary heat.

14. Outlook purchased the 100hp gas-fired boiler to provide temporary heat for its facility. Natkin began to install the boiler on Outlook's premises on January 22, 1997.

15. The installation of the 100hp gas-fired boiler on Outlook's premises was completed on or about February 2, 1997.

16. In January, 1997, before the 100hp gas-fired boiler was ordered to provide heat on a temporary basis, Burbach contacted Lucke at Peoples for an estimate of the utility costs for a 100hp gas-fired boiler.

17. Lucke routinely provides estimates of utility costs for business customers that are expanding, relocating or converting their operations. In doing so, Lucke uses a standard formula developed by Peoples in which the hours of operation are multiplied by the gas input and a regional factor. The resulting figure is the customer's annual gas consumption.

18. Burbach provide Lucke with Outlook's hours of operation during the winter months, which he had obtained from Dan Zysset, an Outlook employee, and the 4.5 million BTU rating of the old 165hp wood-fired boiler, which was slightly higher than the 4 million BTU rating of the 100hp gas-fired boiler that was ultimately ordered and installed to provide temporary heat. Lucke increased the hours of operation provided by Zysset from eight to ten to sufficiently account for Outlook's heating needs. Based on that information, Lucke estimated that the utility costs of operating the gas-fired boiler would be approxi-

mately $17,900 a year. Using Peoples' standard formula, Lucke arrived at the $17,900 figure by multiplying the natural gas input (4.5 million BTUs) by the number of hours of operation (10) and then multiplying the resulting figure by 90, a regional factor applied to all estimates done in Nebraska. Application of the formula resulted in an estimated annual gas consumption of the gas-fired boiler of 4,050 thousand cubic feet. By multiplying the annual gas consumption by the gas rate and adding the service charge, Lucke arrived at the estimated annual total utility cost of $17,900 for the gas-fired boiler.

19. In early February, 1997, Burbach communicated to Anderson the estimated utility costs calculated by Lucke. *At that meeting, Anderson informed Burbach that the annual cost of operating the wood-fired boiler previously utilized by Outlook, was approximately $18,000, and concluded that the estimated fuel costs of the 100hp gas-fired boiler would be roughly equal to what the cost of fueling the 165hp wood-fired boiler had been.* (Filing 57, Ex. 9, Burbach dep. ex. 45; Ex. 3, Anderson dep. 215:8–25; Ex. 5, Burbach dep. 66:10–67:13) [1]

Outlook: In fact, the calculations were performed by Burbach based on the information provided by Outlook. Burbach was the one who concluded that the estimated fuel costs of the 100hp gas-fired boiler would be equivalent. (Filing 61, Ex. C, Burbach dep. 62:19–67:13; Ex. K, Burbach dep. ex. 38) [2]

20. *The calculations performed by Lucke and communicated by Burbach to Anderson were estimates of the future utility costs of operating the 100hp gas-fired boiler.* (Filing 57, Ex. 10, Anderson dep. ex. 9; Ex. 3, Anderson dep. 203:17–24; Ex. 4, Anderson dep. 224:18–228:6) [3]

1. Burbach Deposition Exhibit 45 (filing 57, Ex. 9) is not identified in the filed portions of the deposition (filing 57, Ex. 5). It appears to be a unsigned, typewritten letter, dated May 27, 1998, from Lucke to Burbach, together with handwritten notes dated January 16, 1997. The letter states in part:

I have included what information I have re: the ROUGH estimate of consumption/cost for SealRite. As you will recall, This was only an estimate and it was made with the following assumptions: 4.5 MMBTUH input. 10 hours per day.

Burbach testified that he calculated the $18,000 cost to operate the wood-fired system based on information provided by Anderson. Anderson testified that during the meeting Burbach wanted to know how the gas cost would compare to the wood cost, "[s]o we called up Mark Shuck and how much wood are we buying, Mark, what are we paying for it, what's the cost." According to Anderson, the costs were roughly equal.

2. Burbach Deposition Exhibit 38 is identified as containing notes that Burbach made during a telephone conversation with Lucke, on or about January 16, 1997, in which Lucke provided an estimated annual cost figure of $17,900 for firm gas service, and as also containing the $18,000 wood-cost calculation that Burbach made during his subsequent meeting with Anderson, based on numbers that he requested from Anderson. Whether Burbach reached any conclusion regarding the comparative cost of operation of the boilers is not stated in his testimony.

3. Anderson Deposition Exhibit 9 (filing 57, Ex. 10) is not identified in the filed portions of the deposition (filing 57, Ex. 3, 4). It appears to be a faxed letter, dated April 28, 1997, from Burbach to Jack Struyk, who also is not identified, but who appears to be an insurance agent or broker. The letter states in part:

After the Kewanee boiler failed, I located a boiler that was in a supplier's inventory in Souix (sic) City, Iowa. This new boiler is rated at 4,035,000 BTU and the old boiler's name plate indicated a 4,496,000 BTU rating. Since new boilers are generally more efficient and the old unit was being fired with wood chips, this difference in rating did not appear to be a problem.

However, the horse power rating of the old boiler was 165 and 100HP with the new one. Normally the BTU rating and horse power convert back and forth to each other. I incorrectly assumed, that since the BTU's matched, the new boiler would provide the required hot water.

Due to the time of heating season and the need to get the facility back in operation, we installed the 100HP boiler. To provide Outlook Windows with the heating capacity of 165 HP, we can install a 65HP boiler

Outlook understood that the actual utility costs would depend on a number of factors, including the temperature at which the building was maintained during the winter season, the rates the gas company was charging at the time, the severity of the winter season, etc.

Outlook: Outlook disputes the inference that the calculation performed by Lucke and communicated by Burbach to Anderson were estimates of the future utility costs of operating the 100hp gas-fired boiler. The estimate was to be an estimate of the overall heating costs based on existing facts utilizing the same heat loads in an average winter. (No citation to evidence index)

21. During the months of February and March, after its installation, the 100hp temporary gas-fired boiler did not generate sufficient heat to adequately heat Outlook's building.

22. After the determination was made that additional heating capacity would be needed, a disagreement developed between Outlook and Travelers as to the size of an additional boiler for which Travelers would pay.

23. At Outlook's request, Natkin advised Outlook and Travelers that a 65hp gas-fired boiler could be installed to operate in tandem on a permanent basis with the 100hp gas-fired boiler that had been installed to provide heat on a temporary basis. Travelers' position was that it would only pay for the addition of a 30hp gas-fired boiler.

24. On July 10, 1997, Anderson advised Travelers that:

We expect Travelers to provide a heat source equivalent to the existing source and capability. If this means that we have to go back and install a new Kewanee model 7L284 [wood-fired boiler], then maybe we need to do so.

Anderson also pointed out to Travelers that with the old wood-fired boiler, Outlook "derived fuel form our scrap wood. With the current system [100hp gas-fired boiler], we have to purchase natural gas, at an additional cost...."

25. *The disagreement between Outlook and Travelers regarding the size of an additional boiler for which Travelers would pay was resolved at the end of July, 1997, and Outlook decided to install the 100hp gas-fired boiler on a permanent basis and purchase a 67hp gas-fired boiler to operate in tandem with the 100hp gas-fired boiler.* (Filing 57, Ex. 2, Burbach aff. ¶ 14; Ex. 3, Anderson dep. 93:8–24, 110:18–23) [4]

Outlook: The decision to install the 100hp gas-fired boiler on a permanent basis and purchase a 67hp gas-fired boiler was a joint decision between Outlook and Travelers based on Natkin's representations.

similar to the new unit. I suggested to Outlook Windows, Craig Anderson, that they consider a boiler of the same capacity (100HP) as the other new unit, but he indicated that they wanted to match heating capacity of the old system.

Anderson agreed with defense counsel's statement that "you testified that sometime in February of 1997, you had discussions with Mr. Burbach about the cost estimates for having a gas-fired system as compared to what you had under the wood-fired system, you were told they'd be comparable and you made your decision to go with the gas-fired boiler." When asked if it was correct that "in those discussions Mr. Burbach gave you some figures that he indicated to you was his estimate of what operating the gas-fired boiler would cost in terms of gas bills," Anderson replied that "[h]e gave us an estimate of what it would cost to heat the plant." This statement was then clarified as referring to the cost to heat the plant "using gas."

4. The disputed statement is taken directly from Burbach's affidavit. Anderson testified that Burbach recommended the second boiler and that Jack Struyk was supportive of it. Anderson told them that he was agreeable to the recommendation if it would meet his heating needs, and that Burbach indicated that it would.

(Ex. 61, Ex. B, Anderson dep. 87:6–15)[5]

26. Natkin commenced the work necessary to permanently install the 100hp gas-fired boiler on or about August 27, 1997, and began installation of the 67hp gas-fired boiler in early October, 1997. Natkin completed the permanent installation of the two boilers on or about October 30, 1997.

27. If, rather than purchase the 100hp and 67hp gas-fired boilers to permanently replace the old, damaged boiler, Outlook had decided to purchase and install a 165hp wood-fired boiler, Natkin would have made more money than it did in installing the gas-fired boilers.

28. *When Outlook decided to add the 67hp gas-fired boiler in the summer of 1997, Outlook did not request that Natkin or Peoples provide it with an estimate of the operating costs of running the 100hp gas-fired boiler together with the 67hp gas-fired boiler.* (Filing 57, Ex. 2, Burbach aff. ¶ 16; Ex. 3, Anderson dep. 113:18–114:14)[6]

Outlook: Outlook disputes that it did not request that Natkin or Peoples provide it with an estimate of the operating costs of running the 100hp gas-fired boiler together with the 67hp gas-fired boiler. Outlook assumed there would be no change in the utility costs, and had there been a change in the utility costs by adding the second boiler, and (sic) Peoples and/or Natkin would have brought that information to Outlook's attention before the decision was made. (Filing 61, Ex. C, Burbach dep. 111:9–19)[7]

29. *On March 18, 1999,* Outlook filed this action against Natkin, Travelers and Peoples in the District Court of Lancaster County, Nebraska. (No citation to evidence index)

Outlook: The lawsuit was actually filed on March 19, 1997. (No citation to evidence index)[8]

30. Outlook's claim for damages is made in four claims: (1) fraudulent misrepresentation by Natkin and Peoples; (2) negligent misrepresentation by Natkin and Peoples; (3) breach of implied warranty of fitness for a particular purpose by Natkin; and (4) breach of contract by Travelers.

31. Outlook alleges that the misrepresentations, both fraudulent and negligent, made by Natkin and Peoples were that the 100hp gas-fired boiler would efficiently heat its facility and have an equivalent cost of operation to that of the old wood-fired boiler.

32. *Outlook does not allege the particular purpose for which it claims to have purchased the gas-fired boiler system.* (Filing 1, Petition ¶ 32)[9]

5. Anderson testified that "[t]he decision to utilize the 100–horsepower boiler on a permanent basis would have been between myself, Marv Burbach and with Mr. Gaillard's consent."

6. Burbach's affidavit states: "At no time did Outlook ever request that Natkin or Peoples provide Outlook with additional estimates of the utility costs of running the 100hp gas-fired boiler together with the 67hp gas-fired boiler." Anderson testified that he indicated during a discussion with Burbach concerning the additional boiler that "I was not going to pay more than what I paid before [for fuel]." Anderson did not recall Burbach's answer.

7. Burbach testified that he could not recall there being any discussion when the decision was made to add the second boiler about the comparability of fuel costs between wood and gas.

8. The actual date of filing of the action in state court cannot be determined from the court file. However, the summons that was served on Natkin on March 22, 1999, recites that the action was filed on March 18, 1999.

9. Outlook's petition alleges: "Defendant Natkin was informed by Outlook and thereby had knowledge of the purpose for which the gas-fired boiler system was purchased by Outlook and, at the time of such sale, impliedly warranted the same to be, in all respects, fit and proper for such purpose."

Outlook: While it is true Outlook has not alleged in its Petition the particular purpose for which it claims to have purchased the gas-fired boiler system, Outlook was relying upon Natkin to recommend a boiler system for the particular purpose of heating its facility using a boiler system which had fuel costs equivalent to what it had before. Natkin was aware of Outlook's unique heating system utilizing wood scrap and shavings produced during the construction of doors and windows. Natkin also knew the utility costs were relatively nonexistent to Outlook because of its ability to either burn its wood scraps or sell its wood scraps at a premium to offset the cost of wood chips purchased from a third party. Thus, the particular purpose Outlook had was to have a heating system with equivalent heating costs to what it had prior to the boiler failure. (No citation to evidence index) [10]

## B. Peoples' Statement of Undisputed Facts

1. On January 14, 1997, Outlook's wood-fired boiler suffered a total failure. As many as three safety features on the boiler did not perform their function, allowing the boiler to heat beyond its capacity and virtually melt down.

2. The day after the meltdown, Outlook contacted its servicer, Natkin. One of Natkin's technicians conducted the initial investigation and questioned whether it was possible to repair the boiler. *Either Outlook maintenance personnel or Marv Burbach determined that the boiler had suffered a total failure.* (Filing 50, Ex. A, Anderson dep. 39:20–40:7) [11]

Outlook: Outlook maintenance personnel made no determination, but the determination was made by Marvin Burbach and Jim Marvin in consultation with Travelers. (No citation to evidence index)

3. Due to the fact that the failure had occurred in January, the immediate need was to heat the facility in order to get the business back in operation. Outlook obtained propane heaters as localized temporary heat.

4. At the same time, Mr. Burbach began searching for a replacement boiler. During his search, it became evident to Mr. Burbach that a wood-fired boiler would not be available for an extended period of time. However, a gas-fired boiler was available almost immediately. Mr. Burbach provided that information to Mr. Craig Anderson at Outlook who referred him to Jerry Gaillard at Travelers. Mr. Gaillard authorized the purchase of the gas-fueled boiler for temporary heat.

5. Mr. Burbach contacted Mr. Bill Lucke at Peoples Natural Gas by telephone requesting an estimate for operating costs of a gas-fueled boiler based on certain parameters. Mr. Burbach relayed to Mr. Lucke certain information that in-

---

**10.** Anderson testified that after he learned from Burbach that there was a difference in horsepower rating between the 100hp gas-fired boiler and the old wood-fired boiler, "I instructed Mr. Burbach, Mr. Struyk that—I don't know if Gaillard was involved in the conversation or not—that I wanted equivalent heat source at the same cost and performance as my old one." (Filing 50, Ex. A, Anderson dep. 76:14–18) Anderson also testified that he agreed to accept the 67hp gas-fired boiler "[b]ased on the recommendations that it

would do the job," that "[i]t would meet the original parameters we requested," which were to "[h]eat the plant the same it was before at the same cost. . . ." (Filing 57, Ex. 4, Anderson dep. 229:11–25)

**11.** Anderson testified that either Burbach or the maintenance department, or perhaps both, told him that the boiler was a total failure.

cluded a 4.5 MM BTU rating as well as the hours of operation.

6. A BTU is the amount of energy needed to heat one pound of water one degree Fahrenheit. Mr. Burbach stated to Mr. Lucke that the BTU rating was 4.5 MM (4.5 million BTUs) and the hours of operation were around eight. Mr. Lucke stated that if they used ten hours of operation, they would be on the safe side. Mr. Burbach agreed.

7. Mr. Lucke performed a calculation which he has used for many years in his professional career. The formula takes the natural gas input on an hourly basis, or BTUs, multiplied by an estimated number of hours of operation multiplied by a regional factor, which results in gas consumption per year, measured in thousand cubic feet:

$$\text{BTUs} \times \text{Hours} \times \text{factor} = \text{Mcf of gas.}$$

Peoples generally estimates that gas-fueled boilers will operate for 10 hours per day, because that is an average it has seen over the years. Years ago, Peoples developed regional factors based on actual usage by randomly chosen customers, which account for the severity of the weather, and uses a factor of 90 for all customers in Nebraska. After obtaining the gas consumption using the formula, Mr. Lucke multiplied the gas consumption by Peoples' firm rate for gas and added the $12 per month ($144/year) customer charge for the meter to reach the rough estimate for a yearly natural gas cost.

8. After he had performed the calculations which he had used for many years in his professional career, Mr. Lucke returned Mr. Burbach's phone call. *He provided a rough estimate to Mr. Burbach of* *approximately $17,900 annual cost to run the gas-fueled boiler.* (Filing 50, Ex. E, Lucke dep. 60:22–61:4; Ex. D, Burbach dep. 66:10–14) [12] *When Bill Lucke called Mr. Burbach with the estimated yearly cost, he told Mr. Burbach he had enough information to give him a "very rough estimate."* (Filing 50, Ex. E, Lucke dep. 60:24–61:4)

Outlook: Outlook disputes that Lucke's estimate was a "rough estimate." In fact, Lucke admitted to one of his co-employees that his estimate was a "good one." (Filing 61, Ex. G, Nordell dep. 9:19–10:19) [13]

9. Mr. Lucke was not asked by Mr. Burbach to contact anyone at Outlook. Mr. Lucke was not asked to, and in fact did not, perform a cost comparison between gas-fueled boilers and wood-fired boilers.

10. Mr. Lucke did not receive any requests to perform any further estimates of operating costs.

11. Mr. Anderson had discussions with Mr. Burbach about replacing the wood-fired boiler with a gas-fueled boiler on a permanent basis. Mr. Burbach provided the estimate to Mr. Anderson at Outlook. Mr. Burbach then requested that Mr. Anderson provide Mr. Burbach certain information regarding the wood-fired boiler.

12. Upon receiving information about the wood-fired boiler from Mr. Anderson, Mr. Burbach performed a cost comparison and determined that the costs of operating the gas-fueled boiler would be approximately the same. *Mr. Anderson admits that the estimate supplied by Mr. Burbach*

---

**12.** Lucke testified that he gave the estimate to Burbach over the phone. When asked by counsel if he felt he had enough information to give an estimate of the costs, Burbach stated: "I had enough information to give him a very rough estimate is what I said. And I think then I followed it up with a short note to him. And I think I even—even capitalized the rough estimate based on the natural gas input, 10 hours per day and our calculation that we had used." Burbach's brief

testimony concerning this conversation does not mention the "rough estimate" comment.

**13.** Donald J. Nordell, who is not specifically identified, but who appears to be a Peoples' employee, testified that Lucke "mentioned to me that based on the information that he was provided, he thought he gave a pretty darned good estimate and that was it."

*was an estimate for future and unknown costs.* (Filing 50, Ex. B, Anderson dep. 227:22–228:6) [14]

Outlook: Outlook disputes the inference that Anderson knew the estimate supplied by Mr. Burbach was an estimate for future and unknown costs. While Outlook agrees it is impossible to predict the weather, particularly in Nebraska, the estimate was to have been an average estimate based on current gas consumption. (No citation to evidence index)

13. *In or around early February 1997, Mr. Anderson decided to replace the wood-fired boiler with a gas-fueled boiler on a permanent basis.* (Filing 50, Ex. A, Anderson dep. 86:11–87:10) [15]

Outlook: Outlook disputes it was Mr. Anderson who decided to replace the wood-fired boiler with the gas-fired boiler on a permanent basis. This decision was made with the approval of Travelers, because Mr. Anderson would not incur any costs without Travelers' approval and/or consent. (Filing 61, Ex. B, Anderson dep. 87:6–15) [16]

14. Outlook's 100hp boiler has a BTU rating of 4.035 MM.

15. In early spring of 1997, Mr. Anderson requested additional capacity to heat his facility. When Outlook decided to install a second gas-fueled boiler, Mr. Burbach again called Peoples, but his concern was whether Peoples had adequate pressure and natural gas to serve the additional load. However, neither Mr. Anderson nor Mr. Burbach asked Mr. Lucke for an estimate of gas costs for the additional capacity.

16. In the fall of 1997, additional capacity in the form of a 67hp gas-fueled boiler was installed with a 3.5 MM BTU rating (3.5 million BTUs). With the addition of the second gas-fueled boiler, the overall BTU rating of the facility nearly doubled.

17. Outlook contends that is gas bills were approximately $30,000.00 per year. When its gas bills proved to be higher than the estimate Mr. Lucke had given Mr. Burbach, Outlook refused to pay.

## C. Travelers' Statement of Undisputed Facts

1. Travelers provided property insurance coverage to Outlook Windows Partnership ("Outlook") under policy No. BAJ–BMC–227X1256–TIL–96 with effective dates of January 12, 1996 to January 31, 1997. The Travelers' policy contained a standard Boiler and Machinery Coverage Form (BM 00 25 06 95) which stated in pertinent part:

### BOILER AND MACHINERY COVERAGE FORM

\*　　\*　　\*　　\*　　\*　　\*

A. COVERAGE

We will pay for direct damage to Covered Property caused by a Covered Cause of Loss.

1. Covered Property

Covered Property, as used in this Coverage Part means any property that:

a. You own; . . .

\*　　\*　　\*　　\*　　\*　　\*

3. Covered Cause of Loss

A Covered Cause of Loss is an "accident" to an "object" shown in the Declarations.

\*　　\*　　\*　　\*　　\*　　\*

---

14. Anderson simply agreed with defense counsel's statement that "you understood that Mr. Burbach was giving you an estimate of what the expenses were going to be in the future."

15. Anderson testified that the decision involved himself, Burbach, and Gaillard.

16. See footnote 5.

E. BOILER AND MACHINERY CONDITIONS

The following conditions apply in addition to the Common Policy Conditions:

\* \* \* \* \* \*

1. Loss Conditions

\* \* \* \* \* \*

j. Valuation

(1) We will pay you the amount you spend to repair or replace your damaged property directly damaged by an "accident." Our payment will be the smallest of:

(a) The Limit of Insurance;

(b) The cost of the time of he (sic) "accident" to repair the damaged property with property of like kind, capacity, size and quality;

(c) The cost at the time of the "accident" to replace the damaged property on the same site with other property:

(i) Of like kind, capacity, size and quality; and

(ii) Used for the same purpose;

(d) The amount you actually spend that is necessary to repair or replace the damaged property.

2. On January 14, 1997, Outlook's wood-fired boiler system failed. *According to Outlook, the wood-fired boiler which failed had a rated capacity of 165 horse-* power. (Filing 55, Ex. B, Struyk dep. 51:14–16) [17]

Outlook: The determination of the capacity of the wood-fired boiler was made by Marvin Burbach. (Filing 61, Ex. J, Zysset dep. 65:16–25) [18]

3. Shortly after the failure, Outlook's wood-burning boiler was replaced by a 100 horsepower gas-fired boiler. The 100 horsepower gas-fired boiler was recommended to Outlook by Natkin, the company which serviced Outlook's boiler system. Travelers telephonically authorized payment of the gas-fired boiler recommended by Natkin. *However, Travelers never insisted or required that Outlook replace its wood-fired boiler with a gas-fired boiler.* (Filing 55, Ex. C, Anderson dep. 87:12–22) [19] The installation of the 100 horsepower gas-fired boiler was completed on February 2, 1997.

Outlook: Travelers knew Outlook was looking to Travelers to make a determination as to what costs would be covered under the policy because Outlook would not replace or incur any costs unless it was covered by the policy of insurance. (Filing 61, Ex. B, Anderson dep. 44:18–45:1) [20]

4. Travelers formally acknowledged coverage for the loss through correspondence from its adjuster, Gerald Gaillard, to

[17.] Jack H. Struyk, Jr., who is not specifically identified, but who appears to be an employee of Outlook's insurance broker, AON Risk Services, Inc., testified that he understood the wood-fired boiler was rated at 165 horsepower.

[18.] Daniel Zysset, who is not specifically identified, but who appears to be an Outlook employee, testified that he and Burbach together looked at the information plate on the boiler.

[19.] Anderson, after testifying that the decision to utilize the 100hp boiler on a permanent basis was made by himself and Burbach with Gaillard's consent, responded negatively when asked, "Did Mr. Gaillard ever have any conversations with you wherein he told you that you had to go with gas as opposed to wood?" Anderson also answered "No" when asked if Gaillard had ever insisted that the company utilize a gas-fired boiler after this loss.

[20.] With reference to his telephone conversation with "someone at Travelers about what we were supposed to do and what we were authorized to do" which occurred shortly after the boiler failure, Anderson testified: "And my concern was I didn't go out and do something I wasn't supposed to, commit myself to a huge bill and the insurance company wasn't going to pay for. I wanted explicit instructions from the insurance company what I could and couldn't do."

Craig Anderson of Outlook dated February 2, 1997.

5. Prior to the installation of the 100 horsepower gas-fired replacement boiler, Marvin Burbach of Natkin provided Craig Anderson of Outlook with a verbal estimate of the annual fuel costs for operating the 100 horsepower gas-fired boiler. *Travelers never provided Outlook with an estimate of fuel consumption costs for the 100 horsepower gas-fired boiler.* (Filing 55, Ex. C, Anderson dep. 111:2–8; Ex. A, Gaillard aff. ¶ 6) [21]

> Outlook: While it is true Travelers never provided Outlook with an estimate, Travelers confirmed on several occasions that it was relying upon the fact that fuel consumption costs would be equivalent in authorizing the conversion from a wood-fired boiler to a gas-fired boiler. (Filing 61, Ex. K, dep. ex. 3 & 5) [22]

**21.** Anderson agreed with defense counsel's statement that "Mr. Gaillard or any representative of Travelers did not provide you with any calculations of estimated fuel costs of the gas-fired boiler or boilers that were installed after the incident." Gaillard states in his affidavit: "At no time did Travelers provide Outlook with any calculations or estimates of the additional fuel costs associated with operating the 100 horsepower replacement boiler, the additional 67 horsepower boiler, or the combination of those two boilers."

**22.** Deposition Exhibit 3 is not identified, but appears to be an internal memo prepared by Gaillard. It states in part:

> American Boiler has located a new 100 HP L.E.S. FTFB boiler, gas fired, and available for $31,000.00 plus installation. He was not certain wheter or not the Insured would want to make the fuel change, but he is certain that the capacity would meet the Insured's needs, due to the gross inefficiency of the current arrangement. This would obviously (sic) affect the Insured's operating costs. There would be increased efficiency, but there would be added fuel expense, and the Insured would need to dispose of the waste wood chips and sawdust. . . .

6. Sometime in the spring of 1997, Outlook determined that the 100 horsepower gas-fired boiler was not adequately heating its facility. Outlook contacted Natkin and Travelers regarding the problem.

7. Mr. Burbach of Natkin determined that additional capacity would be required to adequately heat Outlook's space. A dispute between Travelers and Outlook arose as to how much additional capacity was necessary. Based on his investigation of the rated capacity of the failed boiler, Mr. Gaillard, Travelers' representative, believed that Outlook was entitled to an additional 25 horsepower capacity. Outlook believed that the rated capacity of the failed wood-fired boiler had been 165 horsepower and that it should receive additional capacity to match this horsepower rating.

8. In July 1997, Travelers agreed to provide Outlook with a 67 horsepower gas-fired boiler to supplement the capacity of the 100 horsepower gas-fired boiler, just as Outlook had requested. *Neither Nat-*

> I spoke with Jack Strike (sic), Aon, and he was not certain whether (sic) or not the Insured would be eager to make the switch to an alternate fuel, although the old boiler did apparently use gas as a fuel to start the boiler. I advised we should make the offer, and then research alternate installations if the Insured elects to go with the same design. That would involve a considerable amount of additional expense and could double the size of the loss, as well as increase the size of the continuing BI loss, and possibly necessitate the need for a rental boiler to offset the loss.

Deposition Exhibit 5 is not identified, but appears to be an internal memo prepared by Al Spary, who also is not identified, but who appears to be a Travelers' representative. The memo states in part:

> According to Natkin the total cost of a gas boiler would run $60,000 and a like replacement wood burning boiler, which is available would run in the area of $80,000. A gas boiler could be there in 5 days or less. The wood boiler would take a month or two. Fuel costs for both boilers would be about the same according to Natkin and the gas utility. Thye (sic) buy the wood chips as what they produce is only a small amount of what they need. There is a market for their wood chips.

*kin nor Travelers provided Outlook with any calculations or estimates of the additional fuel costs associated with operating the 100 and 67 horsepower boilers combined.* (Filing 55, Ex. C, Anderson dep. 111:2–8, 234:19–24; Ex. A, Gaillard aff. ¶ 6; Ex. E, Burbach dep. 177:9–19, 178:13–16) [23]

> Outlook: Mr. Gaillard from Travelers admits he was operating under the assumption the fuel costs would be equivalent even at the time the 67 horsepower boiler was added. (Filing 61, Ex. A, Gaillard dep. 79:23–80:7) [24] Marv Burbach never mentioned to Anderson that there would be any additional fuel costs associated with adding the second boiler. (Filing 61, Ex. C, Burbach dep. 111:9–19) [25]

**23.** See footnote 21 regarding the designated portions of the Gaillard affidavit and Anderson deposition (excluding page 234, which is not in evidence). Burbach testified that his discussions with Anderson related to the fuel costs for the 100hp boiler, and that he did not provide Anderson with calculations of the fuel cost with respect to the 100hp and the 67hp boilers combined.

**24.** Gaillard was asked: "Now, through August 6, 1997, had anyone discussed with you an issue regarding whether the fuel costs would be gas fired boiler or equivalent to fuel cost on the wood boiler?" He answered, "No." He was then asked: "So you were still operating under the assumption that those costs would be equivalent, correct?" Gaillard answered, "Yes."

**25.** See footnote 7.

**26.** Gaillard's affidavit identifies a memorandum from Anderson, dated July 10, 1997, which is attached to the affidavit as Exhibit 3. It states as follows:

> I received your letter dated June 19th, 1997 reference the capacity on the Kewanee Boiler. To some degree, I feel that we are looking at this entirely wrong.
> My number one concern is to adequately heat the facility, and to provide room for expansion. We expect Travelers to provide a heat source equivalent to the existing source and capability. If this means that

*9. Not later than July 10, 1997, Outlook was aware of the additional cost of natural gas necessary to operate the 100 horsepower gas fired boiler.* (Filing 55, Ex. A, Gaillard aff. ¶ 7) [26]

> Outlook: Outlook was simply aware of the fact that it had to purchase natural gas, whereas in the past, it could burn the wood scraps, rather than actually acquire fuel from an outside source. Beginning in 1995, Outlook did purchase wood scraps from an outside vendor. It did so only because it found it was more economical to sell its wood scrap at a premium and purchase wood chips to serve as the fuel source. (Filing 61, Ex. B, Anderson dep. 103:13–106:14) [27]

we have to go back and install a new Kewanee model 7L284, then maybe we need to do so. With the Kewanee system, we derived fuel from our scrap wood. With the current system, we have to purchase natural gas, at an additional cost to us. Again, our overall concern is the ability of the system to adequately heat the plant. We will require written assurances from Travelers, that the proposed 30 hp addition will adequately heat our facility. In the event that cold weather hits next winter, and the system is incapable of heating facility, we expect Travelers to rectify the system by providing additional capacity at that time, regardless of the hp rating or btu's. The old Kewanee was capable of adequately heating the facility in the dead of winter, and was affordable. Item could heat the plant during the winter and still cycle on and off. The new system should have an equivalent performance. Running 100% of the time would indicate that regardless of the hp rating, it is not equivalent to the previous unit.
All that I require is a warm plant in the winter time. We expect the proposed system to do the same, at an affordable energy cost.

**27.** Anderson testified that the statement in his letter that "we have to purchase natural gas at an additional cost to us" did not mean that there was a perceived difference in cost between gas and wood, but only that Outlook

10. *Outlook made a formal claim to Travelers arising from the January 14, 1997 failure and submitted a Sworn Statement in Proof of Loss dated August 6, 1997, in the amount of One Hundred Five Thousand, Three Hundred Ninety–Two and 59/100 dollars ($105,392.59) in support of its claim.* (Filing 55, Ex. A, Gaillard aff. ¶ 9; Ex. F, Swanson dep. 38–40) [28]

Outlook: The sworn statement of proof of loss was actually prepared by Travelers. (Filing 61, Ex. I, Fridholm dep. 55:13–56:4) [29]

11. The amount claimed in Outlook's Sworn Statement included the cost of both the 100 and the 67 horsepower gas-fired boilers installed to replace the failed wood-burning boiler.

12. *On August 6, 1997, in exchange for payment of $105,392.59, Outlook signed and executed an agreement releasing Travelers from all claims arising from the failure of the wood-fired boiler in January of 1997.* (Filing 55, Ex. A, Gaillard aff. ¶ 10; Ex. F, Swanson dep. 41–42) [30]

Outlook: The release speaks for itself.

13. Prior to execution of the August 6, 1997 Release, Outlook never submitted a proof of loss or claim to Travelers for the replacement of the failed boiler with a similar wood-fired boiler. On March 19, 1997, Outlook initiated this lawsuit against Travelers, seeking damages for the cost of installing a new wood-fired boiler plus the additional costs it has incurred for the payment of gas for the replacement boilers.

14. *As of this date, Outlook has never replaced the two gas-fired boilers installed in 1997 with a wood-fired boiler of the same type and kind as existed in Outlook's premises prior to January 14, 1997.* (Filing 55, Ex. G, Plaintiff's answer to Interrogatory No. 7) [31]

---

had to purchase natural gas, whereas it could burn its own scrap wood. He described the statement as "a little bit of a negotiating position." He also testified that at the time he wrote the letter, Outlook had not received any billing from Peoples for the actual gas usage.

**28.** Gaillard's affidavit states: "Travelers received a Sworn Statement in Proof of Loss, executed by Marlene Swanson of Outlook and dated August 6, 1997, in the amount of $105,-392.59." A copy of the proof of loss statement is attached to the affidavit as Exhibit 5. It states that the replacement cost of the boil-er at the time of loss was $110,392.59, which is the only loss and damage reported. Less a $5,000 deductible, the total amount claimed under the policy was $105,392.59. Swanson testified that the papers were delivered by Mr. Struyk, and that she understood the "total amount claimed" to be what the insurance company was paying.

**29.** Kathleen Fridholm, who is not identified, but who appears to work with Jack Struyk, testified that the typewritten entries on the proof of loss statement, including the dollar amounts, were made by Travelers.

**30.** Gaillard's affidavit states: "Travelers received an agreement executed by Outlook releasing Travelers from all claims arising from the failure of the wood-fired boiler in January 1997." A copy of the release is attached to the affidavit as Exhibit 6, and reads as follows:

RELEASE

$105,392.59 ———————— 19——

RECEIVED of the Travelers Indemnity Company, the sum of *One Hundred Five Thousand Three Hundred Ninety–Two and 59/100* Dollars, in full settlement and final discharge of all claims by *Outlook Windows Partnership* under Policy No. *BMC–227X1956* arising from *"damages to a Kewanee watertube boiler"* which occurred on or about the *the 1st* day of *January 1997*.

s/ Jack Struyke ——————————————— s/ Marlene Swanson Sec/Treas ———————————
Witness Insured

Swanson testified that she was authorized to sign the release on behalf of Outlook.

**31.** Outlook's answer to Interrogatory No. 7 states: "The 100HP and 65HP boiler systems have not been replaced."

Outlook: The replacement of the wood-fired boiler by the gas-fired boilers was done under the mistaken belief that these boilers were of the same kind, capacity, size and quality as existed in Outlook's premises prior to January 14, 1997. (Filing 61, Ex. A, Gaillard dep. 65:2–8) [32]

## II. DISCUSSION

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir.), *cert. denied*, 513 U.S. 929, 115 S.Ct. 319, 130 L.Ed.2d 280 (1994). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir.1997), *cert. denied*, 523 U.S. 1004, 118 S.Ct. 1186, 140 L.Ed.2d 316 (1998).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with " 'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.' " *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir.1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir.1992), *cert. denied*, 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. "Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

### A. Fraudulent Misrepresentation Claim Against Natkin and Peoples

 In order to maintain an action for fraudulent misrepresentation, a plaintiff must allege and prove the following

---

**32.** Gaillard was asked by plaintiff's counsel: "You and the insured were both operating under the assumption that the equivalency of the fuel cost was part of the reason why we had a replacement that was of like kind, capacity, size and quality, correct?" Gaillard answered, "Yes."

elements: (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely upon it; (5) that the plaintiff reasonably did so rely; and (6) that the plaintiff suffered damage as a result. *Cao v. Nguyen,* 258 Neb. 1027, 1031, 607 N.W.2d 528, 532 (2000). Intent to deceive is not an indispensable element of a cause of action for fraud based on misrepresentation. *Foiles v. Midwest Street Rod Ass'n of Omaha,* 254 Neb. 552, 556–57, 578 N.W.2d 418, 422 (1998).

■ Because the gas cost estimate that was provided to Outlook was a matter of opinion regarding the future operation of the heating system, Natkin and Peoples argue that an action for fraudulent misrepresentation cannot be maintained. Generally, fraud cannot be based on predictions or expressions of mere possibilities in reference to future events. *NECO v. Larry Price & Associates,* 257 Neb. 323, 329, 597 N.W.2d 602, 606 (1999). There are, however, certain exceptions to this general rule.

■ One exception is where a representation concerning a future event is falsely and fraudulently made with an intent to deceive. *See Mueller v. Union Pacific R.R.,* 220 Neb. 742, 371 N.W.2d 732, 740 (1985); *Huffman v. Poore,* 6 Neb.App. 43, 56, 569 N.W.2d 549, 559 (1997). This exception most often is applied in cases in which the future event is within the control of the person making the representation. *See, e.g., NECO v. Larry Price & Associates, supra; Mueller v. Union Pacific R.R., supra.* This is not the situation in the present case.

Another recognized exception may be applicable, though. In *Burke v. Harman,* 6 Neb.App. 309, 345, 574 N.W.2d 156, 179 (1998), the Nebraska Court of Appeals approved the following jury instruction:

The recipient of a fraudulent misrepresentation solely of the maker's opinion is not justified in relying upon it in a transaction with the maker, unless the fact to which the opinion relates is material, and the maker (a) purports to have special knowledge of the matter that the recipient does not have, or (b) stands in a fiduciary or other similar relation of trust and confidence to the recipient, or (c) has successfully endeavored to secure the confidence of the recipient, or (d) has some other special reason to expect that the recipient will rely on his opinion.

As noted by the Court in *Burke,* the category delineated in (d) above is "quite expansive" and would seem to include the situation presented by the facts of this case. There is also evidence that Natkin and Peoples had special knowledge regarding gas cost estimates which Outlook did not possess.

■ Outlook must also establish, of course, that it reasonably relied upon the gas cost estimate. Whether a party's reliance upon a misrepresentation was reasonable is a question of fact. *Cao v. Nguyen, supra,* at 1032, 607 N.W.2d at 533. A party is justified in relying upon a representation made to the party as a positive statement of fact when an investigation would be required to ascertain its falsity. *Id.* While no action will lie where ordinary prudence would have prevented the deception, that rule is generally applied where the means of discovering the truth was in the hands of the party defrauded. *Schuelke v. Wilson,* 250 Neb. 334, 549 N.W.2d 176, 182 (1996).

■ Natkin and Peoples argue that Outlook could not have reasonably relied upon the estimated gas cost figure because the estimate was provided with reference to the 100hp boiler only, and it is common sense that the addition of the second (67hp) boiler would increase the cost of operation. The defendants' argument might have merit if the evidence conclusively established that Outlook was

aware that the estimate pertained only to the first boiler. Outlook, however, has presented evidence that it understood the estimate was for the cost of heating its facility with gas, regardless of the size or number of boilers. In other words, when the first boiler proved to be inadequate to heat the facility, Outlook could have assumed that it was consuming less than the estimated amount of gas, and that adding a second boiler would not affect the cost estimate. Significantly, there is also evidence that Peoples neglected to send Outlook any gas bills during this period of time, so Outlook had no knowledge concerning the actual cost of operation of the 100hp gas-fired boiler.

Peoples also argues that the information it supplied to Natkin on Outlook's behalf was accurate. In this connection, Peoples has endeavored to show that its formula, if the second boiler had been taken into account, would have resulted in an estimated annual cost of approximately $29,900 for natural gas, which is consistent with Peoples's actual billings to Outlook.[33] This revised calculation, while tending to validate People's formula, is otherwise irrelevant to the issues that are presented in this case. This is because the only estimate that was provided to Outlook was the $17,900 figure, and Outlook does not claim that such estimate falsely represented the cost of operation of the 100hp boiler. Instead, as stated in the order on final pretrial conference, Outlook claims that the false representation concerned "the cost to heat Outlook's facility." (Filing 66, pp. 4–5)

There is no evidence that Peoples was ever asked to provide an estimate of the cost to heat Outlook's facility, nor that Peoples ever had direct contact with Outlook. All communications took place between Lucke (People's representative) and Burbach (Natkin's representative). It is undisputed that Burbach simply asked Lucke to provide a cost estimate for oper-

ating the 100hp boiler based on its BTU rating and normal hours of operation. There is no evidence that the $17,900 figure that Lucke provided to Burbach was "known to be false or made recklessly without knowledge of its truth and as a positive assertion." Indeed, there is no evidence that the $17,900 figure was not a reliable estimate of the annual cost of operation of the 100hp boiler. It is therefore clear that a claim for fraudulent misrepresentation cannot be maintained against Peoples.

 Natkin, however, occupies a different position because of its direct dealings with Outlook. In this regard, there is evidence that Burbach was aware that Anderson wanted an estimate of the cost to heat Outlook's facility using gas, and that Burbach incorrectly assumed that the 100hp gas-fired boiler would provide adequate heat because its BTU rating was equivalent to that of the old wood-fired boiler. The $17,900 figure that he conveyed to Anderson was not an accurate estimate of the cost to heat Outlook's facility using gas, and there is sufficient evidence from which a jury could reasonably conclude that this representation as to the cost of gas heating, if not knowingly false, was at least made recklessly and without knowledge of its truth. Consequently, Natkin's motion for summary judgment on the fraudulent misrepresentation claim will be denied.

### B. Negligent Misrepresentation Claim Against Natkin and Peoples

 The doctrine of negligent misrepresentation is relatively new in Nebraska and was not recognized prior to the Nebraska Supreme Court's decision in *Flamme v. Wolf Ins. Agency*, 239 Neb. 465, 476 N.W.2d 802 (1991). *See Kouma v. Blue Valley Co-op.*, 6 Neb.App. 714, 715, 576 N.W.2d 854, 855 (1998). Subsequently, in *Gibb v. Citicorp Mortgage, Inc.*, 246 Neb.

---

**33.** The parties have stipulated in the order on final pretrial conference (filing 66, p. 4) that Outlook's gas bills were $33,967.60 for 1997,

$27,904.97 for 1998, $29,785.36 for 1999, and $27,785.36 for the first half of 2000.

355, 518 N.W.2d 910 (1994), the Nebraska Supreme Court officially adopted the definition of negligent misrepresentation found in Restatement (Second) of Torts § 552 (1997). *See id.,* at 716, 576 N.W.2d at 856. Section 552 of the Restatement, at pp. 126–27, reads as follows:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

▮▮▮▮ As previously discussed, there is no evidence that Peoples provided false information to Outlook, either directly or indirectly. That is, there is no evidence that Peoples' cost estimate concerning the operation of the 100hp gas-fired boiler was inaccurate, or that Natkin was misled in any respect concerning the nature of the cost estimate or the basis for its computation. Not until the $17,900 cost estimate was communicated to Outlook by Natkin could it be considered false information. Because there is evidence from which a jury could reasonably conclude that Natkin failed to exercise reasonable care or competence in obtaining or communicating this information to Outlook, the claim for negligent misrepresentation will be allowed to proceed against Natkin.[34]

Outlook argues in its brief that Natkin and Peoples each had a duty to provide a revised cost estimate when the second gas-fired boiler was added. This argument, however, does not advance Outlook's claim for negligent misrepresentation against either defendant. Section 552 of the Restatement limits negligent misrepresentation claims to cases where one party has supplied the other with false information. *See Hawkins Const. v. Intern. Ass'n Local 21,* 3 Neb.App. 238, 243, 525 N.W.2d 637, 642 (1994) (holding that allegations regarding defendant's failure to inform plaintiff of certain facts did not constitute a claim for negligent misrepresentation in Nebraska); *White v. State Farm Mut. Auto. Ins. Co.,* 1995 WL 521004 (Neb.App. Sept.5, 1995) (distinguishing negligent misrepresentation claim from nondisclosure claim). A claim based on a failure to disclose information is instead governed by Restatement of Torts (Second) § 551 (1997).[35]

**34.** This result naturally follows from the determination that Outlook's claim for fraudulent misrepresentation can be maintained against Natkin. As the Nebraska Supreme Court observed in *Gibb, supra,* at 371, 518 N.W.2d at 921:

[T]he difference between fraudulent misrepresentation and negligent misrepresentation is the duty required in each claim. In fraudulent misrepresentation, one becomes liable for breaching the general duty of good faith or honesty. However, in a claim of negligent misrepresentation, one may become liable even though acting honestly and in good faith if one fails to exercise the level of care required under the circumstances.

**35.** Section 551 of the Restatement, at p. 119, provides as follows:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same

*See White, supra; Streeks, supra,* at 590, 605 N.W.2d at 118. In its state-court petition (filing 1), Outlook merely alleges that Natkin and Peoples made affirmative misrepresentations, not that they failed to disclose certain facts. On the basis of this pleading, it is unnecessary to consider whether liability might attach to these defendants for failing to provide Outlook with a revised cost estimate. *See Burke v. Harman, supra,* at 345, 574 N.W.2d at 178 (holding that plaintiff was not entitled to an instruction on nondisclosure, patterned after NJI2d Civ. 15.23, where plaintiff's theory of the case was limited to fraudulent and negligent misrepresentation claims).

However, at the final pretrial conference that was held on August 8, 2000, Outlook listed the following among its controverted and unresolved issues:

8. Whether Peoples or Natkin should have considered the impact on the utility cost estimate when the decision was made to purchase the 67 horsepower boiler to supplement the 100 horsepower boiler.

9. Whether Peoples or Natkin owed such a duty; whether Natkin or Peoples breached such a duty; whether the breach of duty caused damages; and the nature and extent of the damages caused.

(Filing 66, Order on Final Pretrial Conference, p. 7) Natkin and Peoples have both objected to these "omission" issues as not having been specifically pled by Outlook. (Filing 66, pp. 8–9)

Although Outlook did not seek leave to amend within the time prescribed by the court's scheduling order (filing 17),[36] Fed.R.Civ.P. 15(a) provides that "leave shall be freely granted when justice so requires." Given the courts' liberal viewpoint towards leave to amend, it should normally be granted absent good reason for a denial. *Popp Telcom v. American Sharecom, Inc.,* 210 F.3d 928, 943 (8th Cir.2000). Generally speaking, reviewing courts have found an abuse of discretion in cases where the district court denied amendments based on facts similar to those comprising the original complaint. *Id.* The inclusion of a claim based on facts already known or available to both sides does not prejudice the non-moving party. *Id.* In the present case, the nondisclosure claim is closely related to the misrepresentation claims and involves a common set of facts, such that the defendants cannot fairly claim to be prejudiced if Outlook is allowed to pursue this alternative theory of recovery.

liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

**36.** The Eighth Circuit has stated that when the district court has filed a Rule 16 pretrial scheduling order, it may properly require that good cause be shown for leave to file an amended pleading that is substantially out of time under that order. *See In re Milk Products Antitrust Litigation,* 195 F.3d 430, 437 (8th Cir.1999).

Outlook, Natkin, and Peoples to some extent have each briefed the issue of whether there existed an obligation to provide a revised fuel cost estimate, but not with reference to Section 551 of the Restatement. Instead, they have focused on the Nebraska Supreme Court's decision in *Bakody Homes & Dev., Inc. v. City of Omaha*, 246 Neb. 1, 516 N.W.2d 244 (1994), in which it was held that the State Department of Roads was not negligent in failing to provide the plaintiff with corridor maps in response to a specific request for right-of-way plans. Because *Bakody* did not involve a business transaction, but, rather, an information request to a public agency, it is not strictly applicable to the present case.

Applying Section 551 of the Restatement to this case, there is sufficient evidence from which a jury could reasonably conclude that Natkin owed Outlook a duty to disclose that the cost of operating two gas-fired boilers would be more than the original cost estimate of $17,900. Such a duty could be found to exist under subsections (2)(b), (c), or (e) of Section 551.

As to Peoples, on the other hand, there is no evidence to support a finding that it owed a duty to exercise reasonable care to disclose additional cost information. Thus, there is no evidence of any fiduciary or similar relationship between Peoples and Outlook. There is no evidence that Peoples made any partial or ambiguous statement of fact; the original cost estimate that it provided to Natkin was made in response to a specific request concerning the cost of operating the 100hp boiler only. There is no evidence that Peoples subsequently acquired any information that would make its cost estimate untrue or misleading; while Peoples was aware that a second boiler was being installed, and made a determination that it had adequate capacity to serve the additional load, there is nothing in the record to suggest that Peoples should have been aware that Outlook had an understanding that the cost estimate included the second boiler, and Natkin quite clearly did not have such an understanding. As previously discussed, there also is no evidence that the $17,900 cost estimate was false when it was communicated to Natkin. Finally, there is no evidence that Peoples knew Outlook's decision to install the second boiler, and to increase its natural gas consumption, was being made under a mistaken impression concerning the total cost of service that would be provided by Peoples.

Because Outlook did not assert a nondisclosure claim until after the filing of Peoples' motion for summary judgment, and because that motion is specifically limited to the claims for fraudulent and negligent misrepresentation (Counts I and II of Outlook's state-court petition), the court has some hesitation in treating Peoples' motion for summary judgment as extending to the nondisclosure claim. It would appear, however, that any evidence Outlook might have to support this claim should have been presented to the court with reference to the misrepresentation claims since these theories of recovery are interrelated and Outlook has argued in its brief that Peoples was negligent in failing to provide a revised cost estimate. Under these circumstances, it is appropriate that Peoples be dismissed from the action. Should Outlook have additional evidence that is relevant to the nondisclosure claim, it may present the same in connection with a motion filed pursuant to Fed.R.Civ.P. 59.

It is noted that Peoples, in filing its answer (filing 4), asserted a counterclaim against Outlook for unpaid gas bills in the amount of $52,626.31. However, this counterclaim was not preserved in the final pretrial conference order (filing 66). The pretrial order supersedes all previous pleadings and controls the subsequent course of the action. *See Anderson v. Genuine Parts Co.*, 128 F.3d 1267, 1271 (8th Cir.1997); Fed.R.Civ.P. 16(e). It appears, therefore, that Peoples has effected a voluntary dismissal of its counterclaim. So that there will be no confusion, however, the court will order the dismissal of

Peoples' counterclaim without prejudice, pursuant to 28 U.S.C. § 1367(c)(3).[37]

### C. Breach of Implied Warranty Claim Against Natkin

Outlook and Natkin agree that Outlook's third cause of action, for "breach of implied warranty," arises under Neb. Rev.Stat.Ann. (Uniform Commercial Code) § 2–315 (Michie 1995), which pertains to implied warranties of fitness for a particular purpose. The elements of such an implied warranty claim are stated in *Stones v. Sears, Roebuck & Co.*, 251 Neb. 560, 569, 558 N.W.2d 540, 547 (1997):

> A plaintiff relying on the implied warranty of fitness for a particular purpose must prove that (1) the seller had reason to know of the buyer's particular purpose in buying the goods, (2) the seller had reason to know that the buyer was relying on the seller's skill or judgment to furnish appropriate goods, and (3) the buyer, in fact, relied upon the seller's skill or judgment. *Laird v. Scribner Coop*, 237 Neb. 532, 466 N.W.2d 798 (1991). Ordinarily, whether or not the implied warranty of fitness for a particular purpose arises in any individual case is a question of fact to be determined by the circumstances of the contracting between the parties. *See El Fredo Pizza, Inc. v. Roto–Flex Oven Co.*, 199 Neb. 697, 261 N.W.2d 358 (1978). In this regard, a buyer proceeding under this implied warranty must first provide some evidence that the seller knew of the buyer's particular purpose for which the goods are acquired. *See Laird v. Scribner Coop, supra.*
>
> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his or her business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.

§ 2–315, comment 2.

Natkin argues that there is no evidence that Outlook purchased the gas-fired boilers for a specific use peculiar to the nature of Outlook's business, and notes that Outlook has not even alleged a particular use in its petition. Natkin thus analogizes this case to *Stones,* in which the evidence indicated that a gas grill (which caused a house fire) was used for its customary purpose of grilling food, such that § 2–315 did not apply. Because the gas-fired boilers are used by Outlook for their ordinary purpose of heating a building, Natkin concludes that the breach of warranty claim must be dismissed.

Nebraska caselaw does not support Natkin's narrow interpretation of U.C.C. § 2–315. In *Mennonite Deaconess Home & Hosp. v. Gates Eng.*, 219 Neb. 303, 363 N.W.2d 155 (1985), for example, the plaintiff hospital had explored various options for repairing or replacing its old roof, and it was concerned about water leakage around various projections on the roof. The defendant's representative assured the hospital that the Gates one-ply roofing system would handle the problem. It, of course, did not. The Nebraska Supreme Court held that the evidence in the case would support a breach of either an implied warranty of merchantability under U.C.C. § 2–314 or an implied warranty of fitness for a particular purpose under U.C.C. § 2–315, or a breach of both sections. As to the § 2–315 claim, the Court stated:

---

**37.** This statute provides that the district court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction." Because of the amount in controversy, this court does not have original jurisdiction over the subject matter of the counterclaim, and although claims remain pending against Natkin, those claims should no longer be tried in conjunction with Peoples' counterclaim for unpaid gas bills.

Certainly, the jury could find that Gates had reason to know of the hospital's particular purpose for the roof. Likewise, the jury could find that Gates had reason to know that the hospital was relying on Gates' skill or judgment to furnish the appropriately installed roof. Indeed, the hospital told Gates it was. And, finally, the jury could certainly find that the hospital relied upon Gates' skill or judgment. It was only after the hospital was contacted by the representatives of Gates and assured of the quality of the roof that it purchased the Gates roof rather than another one-ply roof. *Id.* at 315, 363 N.W.2d at 164.

Similarly, in *Larutan Corp. v. Magnolia Homes Mfg. Co. of Neb.*, 190 Neb. 425, 209 N.W.2d 177 (1973), a soil compaction substance was applied around the outside of a factory for the purpose of eliminating muddy conditions, especially in areas where forklifts were driven and mobile homes, which were manufactured at the facility, were parked. Considering that the sales representative for the product was aware of the use of the area, and had given assurances that the product could do the job, the Nebraska Supreme Court affirmed the trial court's finding that there was an implied warranty of fitness for a particular purpose. In *Shotkoski v. Standard Chemical Mfg. Co.*, 195 Neb. 22, 237 N.W.2d 92 (1975), a dairy farmer was assured that the defendant's cattle feed supplement would increase milk production. Using the product in the manner directed, however, milk production actually decreased. The Nebraska Supreme Court held that the evidence was sufficient to present a jury question as to the breach of an implied warranty under U.C.C. § 2–315. *El Fredo Pizza, Inc. v. Roto–Flex Oven Co.*, 199 Neb. 697, 261 N.W.2d 358 (1978), involved a pizza oven which did not heat evenly. The Nebraska Supreme Court held that a jury question was presented as to whether the oven had been sold subject to an implied warranty of fitness for a particular purpose.[38]

■ As the above cases demonstrate, it is not necessary that the buyer put the goods to an abnormal use. Because there is evidence that Natkin was aware that Outlook wanted a heating system which would provide the same amount of heat for the same fuel cost as the old system, and that Outlook was relying upon Natkin's expertise in making the selection, Natkin's motion for summary judgment on this breach of warranty claim will be denied.[39]

### D. Breach of Contract Claim Against Travelers

■ In the context of personal injuries, at least, "Nebraska has long followed the majority rule that a settlement agreement which purports to release any and all claims for accident-related damages may

---

**38.** The disputed issue in *El Fredo Pizza* was not whether baking pizzas is a particular purpose of a pizza oven, but, rather, whether the plaintiff actually relied upon the defendant's skill to furnish suitable goods for the plaintiff's business. In this connection, the Nebraska Supreme Court stated: "Comment 1 to section 2–315, U.C.C., provides that whether or not the warranty of fitness for a particular purpose arises in any particular case 'is basically a question of fact to be determined by the circumstances of the contracting. Under this section the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists. The

buyer, of course, must actually be relying on the seller.'" *Id.*, at 703, 261 N.W.2d at 362–63.

**39.** Outlook's claim against Natkin for breach of warranty is substantially similar to its misrepresentation claims. As noted by the Nebraska Supreme Court in *Edwin Bender & Sons v. Ericson Livestock*, 228 Neb. 157, 162, 421 N.W.2d 766, 770 (1988): "A misrepresentation and a warranty are not mutually exclusive and may arise from the same representation on which the cause of action is based." *See also Streeks, Inc. v. Diamond Hill Farms, Inc.*, 258 Neb. 581, 598, 605 N.W.2d 110, 123 (2000) ("Nebraska's U.C.C. does not preclude an action for fraud.")

be set aside on grounds of mutual mistake where there are injuries of a serious character wholly unknown to the parties which were not taken into consideration when the release was executed." *Oliver v. Clark,* 248 Neb. 631, 636, 537 N.W.2d 635, 639 (1995). This rule has also been applied by the Nebraska Supreme Court to a property damage claim settlement. *See Armbruster v. Stanton–Pilger Drainage Dist.,* 169 Neb. 594, 100 N.W.2d 781, 794 (1960).

■ In the present case, though, there is no evidence of an unknown injury. The only injury to Outlook was the loss of the wood-fired boiler, for which Travelers was contractually obligated to pay Outlook the smaller of: (1) the cost at the time of the accident to replace the damaged property on the same site with other property of like kind, capacity, size and quality, and used for the same purpose; or (2) the amount Outlook actually spent that was necessary to replace the damaged property.

It is undisputed that the claim settlement was based on the amount that was actually spent by Outlook to replace the wood-fired boiler with two gas-fired boilers. The additional cost to operate the replacement boilers was not material to the settlement of the claim on this basis. It therefore is irrelevant whether Outlook and Travelers both assumed at the time the release was signed that the cost of operation of the replacement boilers would be equivalent to that of the old boiler, or that the replacement boilers were of "like kind, capacity, size and quality" as the old boiler.

The cost of operation of the replacement boilers is simply a condition which resulted (indirectly) from the covered loss, and a mistaken belief concerning those future costs, even if shared by Outlook and Travelers, cannot void the release. As explained by the Nebraska Supreme Court in *Oliver:*

> [T]he true rule is that the mistake must relate to either a present or past fact or facts that are material to the contract of settlement, and not to an opinion as to future conditions as the result of present known facts. A mistake as to the future development of a known injury is a matter of opinion, and is not one of fact, and is not such a mistake as will avoid a release; ....

*Id.* at 637, 537 N.W.2d at 640 (quoting *Simpson v. Omaha & C.B. Street R. Co.,* 107 Neb. 779, 783, 186 N.W. 1001, 1003 (1922)).

In effect, Outlook is arguing that Travelers guaranteed or insured that the replacement boilers would be equivalent to the old boiler. This is contrary to the plain language of the insurance policy. Because there is no evidence that the release was executed based upon a mutual mistake of material fact, summary judgment will be entered in favor of Travelers.

### III. CONCLUSION

For the reasons stated, summary judgment will be entered in favor of Peoples and Travelers, and the case will proceed to trial against Natkin only, on claims of fraudulent misrepresentation, negligent misrepresentation, nondisclosure, and breach of implied warranty of fitness for a particular purpose (and on Natkin's counterclaim against Outlook for amounts allegedly due on open account). Peoples' counterclaim for unpaid gas bills will be dismissed without prejudice.

IT IS ORDERED:

(1) The motion for summary judgment filed by the defendant UtiliCorp United, Inc., d/b/a Peoples Natural Gas (filing 49) is granted, and it is dismissed from the action;

(2) The motion for summary judgment filed by the defendant Travelers Property Casualty Insurance Company (filing 53) is granted, and it is dismissed from the action;

(3) The motion for summary judgment filed by the defendant York International

Corporation d/b/a Natkin Services (filing 56) is denied;

(4) There being no just reason for delay, final judgment shall be entered by separate document in favor of the defendants Travelers Property Casualty Insurance Company and UtiliCorp United, Inc., d/b/a Peoples Natural Gas; and

(5) Pursuant to 28 U.S.C. § 1367(c)(3), the counterclaim filed by the defendant UtiliCorp United, Inc., d/b/a Peoples Natural Gas (filing 4) is dismissed without prejudice.